**Jana L. METGE, Appellant,**

v.

**CENTRAL NEIGHBORHOOD IMPROVEMENT ASSOCIATION, a Minnesota non-profit Corporation, et al., Defendants,**

**Basim SABRI, Respondent.**

**No. C2–02–249.**

Court of Appeals of Minnesota.

Aug. 20, 2002.

John A. Fabian, III, Nicholas G.B. May, Nichols Kaster & Anderson, PLLP, Minneapolis, for appellant.

Stephen O. Plunkett, Paul B. Kohls, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, for respondent.

Considered and decided by HANSON, Presiding Judge, WILLIS, Judge, and G. BARRY ANDERSON, Judge.

## OPINION

HANSON, Judge.

Appellant sued respondent for defamation and tortious interference with contract based upon respondent's statements and actions that allegedly led to a neighborhood organization's termination of appellant's at-will employment. On appeal from summary judgment dismissing her claims, appellant argues that the district court erred in concluding (1) that the alleged defamatory statements were mere opinion and not defamatory, or were not made with malice, and (2) that the actions alleged to constitute tortious interference with contract were not shown to have caused the termination of appellant's employment, or were justified. We affirm in part, reverse in part, and remand.

## FACTS

In 1992, appellant Jana L. Metge was hired as the Executive Director of the Central Neighborhood Improvement Association (CNIA). CNIA is a community-based nonprofit organization responsible for distributing public and private funds used for the improvement of Minneapolis' Central Neighborhood. She served in that position until 2000 when her employment was terminated by CNIA's Board of Directors.

Metge brought claims for, among other things, wrongful termination of employment, defamation, and tortious interference with contract against CNIA and several individuals connected with CNIA, including respondent Basim Sabri. Sabri is a landlord and developer in the Central Neighborhood and, from time to time, was a CNIA board member and served on CNIA committees.

From October 1999 to March 2000, Sabri served as co-chair of CNIA's Business Development Committee (BDC). The BDC recommends to the CNIA Board of Directors how certain funds allocated to business development in the Central Neighborhood should be spent. Sabri submitted several proposals to the BDC that would benefit his own real-estate development company, Sabri Properties, and then acted on those proposals as co-chair of the BDC.

Metge reported to CNIA's Board of Directors that Sabri was using his leadership position at CNIA to benefit his own business ventures and that his actions constituted self-dealing and violated CNIA's conflicts-of-interest policy. Metge urged CNIA's Board of Directors to hold Sabri accountable for the alleged violations.

Thereafter, Sabri openly declared his desire to see Metge fired as CNIA's executive director. In that connection, Sabri publicly disparaged Metge's performance to the CNIA's board and various community members. On April 7, 2000, Sabri wrote a letter to Metge complaining about her actions in connection with Sabri's attempt to purchase a building at Fourth Avenue and Lake Street. Sabri published the letter to several people, including the

Minneapolis Star Tribune, the mayor of Minneapolis, a Minneapolis city council member, and members of the Minneapolis Community Development Agency. Metge alleges that three of the statements in the letter are defamatory (indicated by italics):

> You have, in previous years, *succeeded in manipulating some of the CNIA board members by feeding them wrong and/or misleading information.* It is apparent that you continue to try to *manipulate current board members to accomplish your own personal goals.*
>
> \* \* \* \* \* \*
>
> Not only is your challenge of [a member of Sabri's staff] right to vote evidence of your efforts to discredit and discriminate against me, it is also evidence of *your willingness to waste CNIA's staff time and resources on a personal goal.*

Metge alleges that in the months before the May 16, 2000, annual meeting of CNIA, Sabri recruited a group of individuals to run for the CNIA Board of Directors for the specific purpose of terminating Metge's employment. Metge further alleges that Sabri brought a large number of people from outside of the Central Neighborhood to the annual meeting to vote for his slate of board candidates. Most of these candidates were elected, including Sabri. Following the election, the new board voted to swear itself in immediately, even though it may have been CNIA's practice for newly elected board members to be sworn in on or after June 1 following the annual meeting. The new CNIA Board of Directors then held a special meeting on May 18, 2000, and voted to terminate Metge's employment. When a controversy arose concerning whether the special meeting was legal, the new Board of Directors was again sworn in on June 27, 2000, at which time it conducted another meeting and voted to ratify all decisions made during the May 18 meeting.

Metge obtained employment as the executive director of another neighborhood association some time later. On April 23, 2001, Sabri posted a public message on the internet. Metge alleges that statements made in the posting refer to her by implication and are defamatory (indicated by italics):

> *And in fact, there were many files pertaining to NRP [Neighborhood Revitalization Program] funds and programs, along with many other materials that were necessary to operate the organization and NRP business that had disappeared when the new board came into office. Not only is there $110,000 of NRP funds currently missing, but as we all know, it costs a lot of money to generate those files and reconstruct those files that are now missing.* I hold the NRP * * * responsible for filing formal charges and investigating this matter. However, to this date, they have done nothing to resolve this very important issue after a formal request was given to them. *Isn't it ironic that the ED at that time (Jana) is currently the ED of another neighborhood group that receives NRP funds? I am wondering when the NRP office will start holding individuals accountable for their actions.* Frankly, I don't see it happening under the current operation of the NRP. *We must have reform and we should start holding people accountable for public money that is clearly misappropriated.*

By an order dated October 2, 2001, the district court granted summary judgment dismissing the bulk of Metge's claims. Later that month, Metge entered into a settlement agreement that settled all of her claims against CNIA and all individually named defendants, except that "Metge preserve[d] her cause of action against Basim Sabri for his individual conduct not as

a director of CNIA."[1] On October 31, 2001, the district court entered its order for judgment dismissing all of Metge's claims against Sabri and incorporating its order and memorandum of October 2, 2001. Metge appeals.

## ISSUES

1. Did the district court err in granting summary judgment in favor of Sabri on Metge's defamation claims?

2. Did the district court and does this court have subject-matter jurisdiction over Metge's claims of tortious interference with contract?

3. Did the district court err in granting summary judgment in favor of Sabri on Metge's claims of tortious interference with contract?

## ANALYSIS

On appeal from summary judgment, we determine whether there are genuine issues of material fact and whether the district court erred in its application of the law. Minn. R. Civ. P. 56.03; *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn. 1990). We must view the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). Even so, summary judgment

is mandatory against a party who fails to establish an essential element of [the] claim, if that party has the burden of proof, because this failure renders all other facts immaterial.

*Lloyd v. In Home Health, Inc.*, 523 N.W.2d 2, 3 (Minn.App.1994). Once the moving party has made a prima facie case that entitles it to summary judgment, the burden shifts to the nonmoving party to

produce specific facts that raise a genuine issue for trial. Minn. R. Civ. P. 56.05; *Thiele v. Stich*, 425 N.W.2d 580, 583 (Minn. 1988). The nonmoving party may not rely on mere averments in the pleadings or unsupported allegations, but must come forward with specific facts to satisfy its burden of production. *Musicland Group, Inc. v. Ceridian Corp.*, 508 N.W.2d 524, 530–31 (Minn.App.1993), *review denied* (Minn. Jan. 27, 1994).

## I

■ Metge argues that the district court erred in granting summary judgment dismissing her defamation claims.

### *Limited–Purpose Public Figure*

■ Metge first challenges the district court's conclusion that she is a limited-purpose public figure for defamation purposes and thus must show actual malice. The determination of a plaintiff's status as a public figure is a question of law, which appellate courts review de novo. *Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 483 (Minn.1985).

■ There are three categories of public figures: an involuntary public figure, an all-purpose public figure, and a limited-purpose public figure. *Id.* at 484. An involuntary public-purpose figure is one who becomes a public figure through no purposeful action of his or her own and is an exceedingly rare classification. *Id.* at 483. An all-purpose public figure is generally described as a celebrity or a prominent social figure. *Id.* at 484. A limited-purpose public figure is one who voluntarily "injects [herself] or is drawn into a particular public controversy and thereby becomes a public figure for a limited range

---

1. The parties agreed that the settlement agreement is to be construed in accordance with the principles set forth in *Pierringer v.* *Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963), and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn.1978).

of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974).

■ Clearly, Metge is neither an involuntary nor an all-purpose public figure. To determine if Metge is a limited-purpose public figure, we must consider whether: (1) a public controversy existed; (2) Metge assumed a purposeful or prominent role in that controversy; and (3) the allegedly defamatory statement was related to the public controversy. *Hunter v. Hartman,* 545 N.W.2d 699, 704 (Minn.App.1996) (citing and adopting test established in *Waldbaum v. Fairchild Publ'ns, Inc.,* 627 F.2d 1287, 1296–98 (D.C.Cir.1980)), *review denied* (Minn. June 19, 1996).

We conclude that Metge qualified as a limited-purpose public figure. The record is replete with newspaper articles about CNIA activities, especially those related to the Neighborhood Revitalization Program (NRP), and its award of public and private funds to neighborhood projects. The specific controversy and the events leading up to the termination of Metge's employment, including Metge's criticisms of Sabri's self-dealing, attracted considerable media attention.

Moreover, though CNIA is a private, non-profit corporation, it is imbued with a public purpose, it is substantially supported with public funds, and its activities are routinely reported in the media. *See Smith v. A Pocono Country Place Prop. Owners Ass'n, Inc.,* 686 F.Supp. 1053, 1057 (M.D.Pa.1987) (finding that a dispute concerning the composition of the board of directors of a private property-development association is a public controversy for purposes of a defamation case). As executive director of the CNIA, Metge assumed a purposeful and prominent role in those controversies in an effort to influence the outcome of the CNIA board decisions. She had enhanced media access and used that access to respond to actions taken against her and present her side of the story. The allegedly defamatory statements most definitely relate to the public controversy concerning the events leading up to the termination of Metge's employment.

*Defamatory Statements/Actual Malice*

■ Metge next challenges the district court's conclusion that the statements Sabri made were either not defamatory or were not made with actual malice. To be considered defamatory, a statement of fact about a plaintiff

> must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him [or her] in the estimation of the community.

*Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980) (citing Restatement (Second) of Torts §§ 558–59 (1977)).

■ Moreover, in order to be actionable, a comment must be reasonably interpreted as stating facts that can be proven false. *See Geraci v. Eckankar,* 526 N.W.2d 391, 397 (Minn.App.1995) (stating that the U.S. Supreme Court made clear that not all opinions are protected by the First Amendment, and "that only statements about matters of public concern not capable of being proven true or false and statements that cannot be interpreted reasonably as stating facts are protected from defamation actions under the First Amendment"), *review denied* (Minn. Mar. 14, 1995).

■ Finally,

> [i]f the plaintiff is a * * * public figure, an essential element of the plaintiff's claim is clear and convincing proof of actual malice, i.e., that the defendant acted with willful or reckless disregard

for the truth or falsity of the matter published.

*Jadwin,* 367 N.W.2d at 480 (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 283–86, 84 S.Ct. 710, 726–29, 11 L.Ed.2d 686 (1964)). "Reckless [disregard] is not measured by whether a reasonably prudent person would have published or would have investigated before publishing." *Connelly v. N.W. Publ'ns, Inc.,* 448 N.W.2d 901, 903 (Minn.App.1989) (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)), *review denied* (Minn. Feb. 21, 1990). Instead, the defamatory statement must have been published with a subjective awareness of its probable falsity, as demonstrated by "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Connelly,* 448 N.W.2d at 903 (quoting *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325).

The district court determined that Sabri's statements were either not defamatory, as being mere opinion; were reasonably supported in fact; or were not made with actual malice. Metge argues that Sabri made four defamatory statements about her.

■ 1. *Kickbacks on a Lake Street Project.* Metge alleges that Sabri stated, during the May 18, 2000, special meeting held by the newly elected CNIA Board of Directors, that she received kickbacks on the Fourth Avenue and Lake Street project. Metge argues that the receipt of kickbacks constitutes a crime and, therefore, the statement was susceptible of a defamatory meaning. *See* Minn.Stat. § 609.86 (2000) (commercial-bribery criminal statute).

But Sabri argues that the alleged statement was made after he was elected to the board and therefore this claim was released in the parties' settlement agree-ment. The settlement agreement unquestionably released all claims against Sabri as a CNIA board member. But, Metge argues that Sabri should not be deemed a board member, for purpose of the release, due to the irregularities associated with the first swearing-in of the newly elected board on May 16, 2000. Metge asserts that Sabri was not a legitimate board member until June 27, 2000, when the new board was sworn in a second time, and argues that her claim based on the May 18 statement was thus not released.

The question is what the parties to the settlement agreement intended when they drew the release to preserve only those claims for Sabri's conduct "not as a director." We look first to the settlement agreement to determine whether it reflects any agreement by the parties as to when Sabri first became a director. *See Wolfson v. City of St. Paul,* 535 N.W.2d 384, 386 (Minn.App.1995) (stating that we initially look to the writing itself to determine the parties' intent), *review denied* (Minn. Sept. 28, 1995).

We observe that the settlement agreement states that Metge's employment was terminated no later than May 31, 2000. This statement reflects recognition by the parties of the legitimacy of the May 16 election, because the newly elected board voted to terminate Metge's employment at the May 18 special meeting and did not vote to ratify that action until June 27. Because the settlement agreement recognizes the legitimacy of the May 16 election of the board, we must construe the settlement-agreement release terms to include all actions taken after Sabri was elected a director on May 16, 2000. Any other construction of the release would be inconsistent with the settlement agreement's statement that Metge was terminated no later than May 31, 2000.

While there is some dispute as to whether Sabri made the alleged statement, the only evidence before the court is that if he made the statement, he did so on May 18. Because Metge released all claims against Sabri as a board member and Sabri was elected to the board on May 16, Metge's claim concerning the alleged May 18 statement has been released.

2. *Financial Mismanagement of CNIA.* Metge alleges that Sabri also stated at the May 18, 2000, meeting that she engaged in financial mismanagement of the CNIA. For the reasons discussed above, any claim concerning this statement is also defeated by Metge's release.

3. *The April 7, 2000, Letter.* Metge argues that the district court erred when it concluded that statements made in Sabri's letter of April 7, 2000, were not actionable because they constituted Sabri's opinion and were not capable of being proven untrue. Courts consider four factors when determining whether a statement is one of fact or opinion: (1) the precision and specificity of the statement; (2) the statement's verifiability; (3) the social and literary context of the statement; and (4) the public context in which the statement was made. *Huyen v. Driscoll,* 479 N.W.2d 76, 79 (Minn.App.1991), *review denied* (Minn. Feb. 10, 1992).

Sabri wrote that Metge "succeeded in manipulating some of the CNIA board members by feeding them wrong and/or misleading information" and that her efforts to "manipulate current board members [were] to accomplish [her] own personal goals." Sabri also accused Metge of "wasting CNIA's staff time and resources on a personal goal." We conclude that Sabri's statements are without precision and specificity; they are not verifiable because the information is subjective; and it is also not likely that the statements would

be understood as facts in the social and public context in which they were made.

4. *The Internet Posting.* Metge argues that the statements in Sabri's internet posting were defamatory because the reasonable implication and inference to be drawn from them was that she was the one who misappropriated the $110,000 from the CNIA. The district court concluded that the message was not defamatory of any person because the message as a whole was critical of the NRP. The court found that it "would be inappropriate in the context of the message and of the community dispute" to permit claims of defamation by implication and that there was no evidence of actual malice.

Defamation by implication occurs when a defendant (1) juxtaposes a series of facts to imply a defamatory connection between them; or (2) creates a defamatory implication by omitting facts. *Diesen v. Hessburg,* 455 N.W.2d 446, 450 (Minn. 1990).

Sabri's posting was part of a continuing on-line dialogue related to the CNIA and NRP. Discussion of matters in the public interest and involving public persons justifies robust, and sometimes even caustic, debate. *Id.* at 453. We conclude that the posting represents a statement of opinion and does not contain such an omission or juxtaposition of facts as would be necessary to establish genuine issues of material fact for defamation by implication.

For these reasons, summary judgment dismissing Metge's defamation claims was appropriate.

**II**

Metge argues that the district court erred in granting summary judgment dismissing her claims for tortious interference with contract.

*Subject–Matter Jurisdiction*

 Sabri argues preliminarily that the courts have no subject-matter jurisdiction over Metge's claim for tortious interference with contract because Minnesota does not recognize a cause of action for tortious interference against a party who lacks the capacity to cause an at-will employee to be terminated.

 The district court did not analyze Metge's claim for tortious interference as an issue of subject-matter jurisdiction. But, the issue of a lack of subject-matter jurisdiction may be raised at any time, even for the first time on appeal, because "[s]ubject matter jurisdiction cannot be conferred upon the court by consent of the parties." *Herubin v. Finn,* 603 N.W.2d 133, 137 (Minn.App.1999) (citation omitted). Questions of subject-matter jurisdiction are reviewed de novo. *Federal–Hoffman, Inc. v. Fackler,* 549 N.W.2d 93, 96 (Minn.App.1996), *review denied* (Minn. Aug. 20, 1996).

Sabri argues that neither the Minnesota Legislature nor the Minnesota Supreme Court has recognized a cause of action for tortious interference with an at-will employment contract by a third party who has no ability to terminate the employee. Sabri cites *Nordling v. N. States Power Co.,* 478 N.W.2d 498 (Minn.1991), in support of this conclusion. In *Nordling,* the supreme court reserved the issue of "[w]hether a tortious interference claim against a [non-supervisory] co-employee * * * might ever lie." *Id.* at 507.

While it is true that the supreme court in *Nordling* only recognized a cause of action for tortious interference against a co-employee who was a supervisor, and thus had the capacity to terminate, the court did not limit such a cause of action against non-employee third parties. *Id.* at 507. The issues involving co-employees are unique because of the concept that a party cannot tortiously interfere with its own contract, and, generally, the actions of an employee are those of the employer. *See id.* at 505 (stating these two principles). Accordingly, *Nordling* recognized that a cause of action generally would not lie for tortious interference against a co-employee unless the co-employee was a supervisor who had the ability to terminate and who acted outside the scope of his or her duties in doing so. *Id.* at 506. But again, the court's holding did not impose any limits on claims against non-employee third parties.

To the contrary, in *Nordling* the supreme court recognized that "a tortious interference claim will lie for an at-will employment agreement" and went on to state that

[t]he at-will employment subsists at the will of the employer and employee, *not at the will of a third party meddler* who wrongfully interferes with the contractual relations of others.

*Id.* at 505 (emphasis added); *see Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361 (Minn.1998) (stating that its holding in *Nordling* was "that third party 'meddlers' should not be permitted to interfere with an at-will employment agreement"). The supreme court did not condition the claim against third parties to only those meddlers who could directly terminate an employee. *See also Kallok,* 573 N.W.2d at 361 (stating "[i]t is well-established that a third party who interferes with and causes the breach of a contract may be held liable for damages"); *Carnes v. St. Paul Union Stockyards Co.,* 164 Minn. 457, 462, 205 N.W. 630, 631 (1925) (stating "[i]t being the law that a [person] who has employment and is discharged by [the] employer solely by reason of the wrongful interference of another, sustains an injury for which the intermeddler is liable"); *Re-*

*statement (Second) of Torts* § 766 (1976) (discussing elements of intentional interference with performance of contract by a third person and not limiting who may be considered an actor). Thus, we conclude that the issue reserved in *Nordling,* of "[w]hether a tortious interference claim against a [non-supervisory] co-employee * .* * might ever lie," is not presented by a tortious interference claim brought against a third party. As a result, the district court and this court have subject-matter jurisdiction over a claim for tortious interference with contract brought against a non-employee third party who allegedly procured the termination of the employment of an at-will employee.

*Procuring Cause/Justification*

Metge argues that the district court erred in determining that there was insufficient evidence to create a genuine issue of material fact as to whether Sabri's conduct caused the majority of the CNIA board to vote to terminate Metge and that. Sabri's conduct was protected by privilege or immunity.

To establish a prima facie case of tortious interference with contract, a plaintiff must show: (1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach. *Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.,* 325 N.W.2d 20, 25 (Minn.1982). "A successful claim requires proof of all five elements." *Bebo v. Delander,* 632 N.W.2d 732, 738 (Minn.App.2001) (citation omitted), *review denied* (Minn. Oct. 16, 2001). Clearly, Metge's evidence provided a prima facie case of elements (1), (2), and (5). The question then becomes whether there was sufficient evidence to establish a prima facie case that Sabri was a procuring

cause of Metge's termination and, if so, whether Sabri's actions were justified.

Metge presented evidence that Sabri recruited individuals to run for the CNIA board positions for the express purpose of terminating Metge's employment; that Sabri further recruited ineligible voters to attend the election and paid them to vote for his slate of directors; that Sabri argued at the special meeting in favor of the termination of Metge's employment; and that the directors recruited by Sabri voted to terminate Metge's employment. We conclude that this evidence presents a prima facie case that Sabri's conduct was a procuring cause of the termination of Metge's employment. That prima facie case precludes summary judgment unless Sabri's actions were justified as a matter of law.

"Justification or privilege is a defense to an action for tortious interference." *Nordling,* 478 N.W.2d at 506. Justification is lost, however, if a bad motive is present. *Id.*

> In other words, while bad motive or malice may not be an element of the tort of tortious interference, it is often persuasive evidence on whether the defendant's conduct was proper and justified or improper and not justified.

*Id.* "A bad motive is sometimes referred to as malice," and in circumstances such as those here, malice means "nothing more than wrongful conduct done without legal justification or excuse, and that actual malice in the sense of ill-will [is] not essential" where the "alleged defendant interferer [is] not employed by the same company as the plaintiff." *Id.*

Thus, the final question is whether Metge produced sufficient evidence to establish a prima facie case that Sabri acted with a bad motive. "Ordinarily, whether interference is justified is an

issue of fact, and the test is what is reasonable conduct under the circumstances." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn.1994). Sabri has the burden of proving justification. *Id.*

Metge presented evidence that Sabri's actions were motivated by his displeasure with Metge because she had raised self-dealing and conflict-of-interest issues against him with the CNIA board. Accepting this evidence as true for purposes of summary judgment, including Metge's allegation that Sabri's conduct violated policies of CNIA, we conclude that Metge presented a prima facie case of bad motive, sufficient to preclude summary judgment.

*Immunity*

■■■ There also appears to be a genuine issue of material fact as to whether Sabri's conduct was protected by immunity under Minn.Stat. § 317A.257 (2000). Generally,

> a person who serves without compensation as a director, officer, trustee, member, or agent of an organization exempt from state income taxation * * * is not civilly liable for an act or omission by that person if the act or omission was in good faith, was within the scope of the person's responsibilities as a director, officer, trustee, member, [or] agent * * * of the organization, and did not constitute willful or reckless misconduct.

Minn.Stat. § 317A.257, subd. 1. It is Sabri's burden to show that his acts were in good faith, were within the scope of his responsibilities, and did not constitute willful or reckless misconduct. *See Rehn v. Fischley*, 557 N.W.2d 328, 333 (Minn.1997) (stating these requirements).

■■■ Determination of immunity is necessarily a mixed question of law and fact. *Id.* Reviewing courts may correct an erroneous application of law, but will accord the district court discretion in its ultimate conclusions and review such conclusions under an abuse-of-discretion standard. *Maxfield v. Maxfield*, 452 N.W.2d 219, 221 (Minn.1990). In reviewing the conclusions, we must carefully examine the explanations given by the court for its decisions. *Id.*

Here, the district court concluded that Sabri was protected by the statutory immunity granted volunteers of non-profit organizations. But, the district court's findings do not address whether Sabri proved he acted in good faith or that his acts were not willful or reckless misconduct. Evidence put forth by Metge suggests that Sabri's actions were the product of ill will toward her in response to the conflict-of-interest issues she raised. At the very least, Sabri's motivations were contested. Therefore, because Sabri failed to establish as a matter of law that his actions were conducted in good faith and without willful or reckless misconduct, summary judgment was not appropriate.

## DECISION

The district court did not err in granting summary judgment dismissing Metge's defamation claims, which were either precluded by Metge's release or were statements of opinion that could not be proven untrue. The district court had subject-matter jurisdiction over Metge's claims of tortious interference with contract, and Metge presented sufficient evidence to establish a prima facie case of the elements of those claims. Accordingly, the district court erred in granting summary judgment dismissing Metge's tortious-interference claims.

**Affirmed in part, reversed in part, and remanded.**