*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0271**

Creative Wealth Strategies, Inc.,
Appellant,

vs.

Kathy Jo Hurd,
Respondent.

**Filed August 31, 2015
Affirmed
Harten, Judge**

Hennepin County District Court
File No. 27-CV-13-17657

Chad McKenney, Donohue McKenney Ltd., Maple Grove, Minnesota (for appellant)

Mark C. Santi, Lucas J. Thompson, Thompson Hall Santi Cerny & Katkov, Minneapolis, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Johnson, Judge; and Harten, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HARTEN**, Judge

Appellant, an investment-services company, challenges the summary judgment granted to respondent, a former client, dismissing appellant's claims of defamation and interference with business and awarding respondent attorney fees and costs under the anti-SLAPP statute and also dismissing appellant's breach of contract, unjust enrichment, and promissory estoppel claims. Because we see no error of law and no genuine issue of material fact precluding summary judgment and no abuse of discretion in the award of attorney fees, we affirm.

## FACTS

Between October and December 2012, respondent Kathy Hurd met four times with Robert Hansen, president of appellant Creative Wealth Strategies, Inc. (CWS), and Rick Adams, a CWS employee, concerning her financial goals. On 27 December 2012, the three of them signed two documents: (1) a Consulting Services Agreement (CSA), whereby CWS would receive 4% of any funds Hurd deposited with CWS as a planning-and-implementation fee and .25% quarterly as an asset-management fee; and (2) an Investment Advisory Agreement (IAA), which provided that Hurd could increase or decrease her CWS-managed assets at any time and had no obligation to implement any investment or insurance transaction through CWS. At this time, Hansen was near the end of a three-month suspension imposed upon him by the Financial Industry Regulatory Authority (FINRA).

On 7 January 2013, Hurd signed documents to authorize the transfer of $2 million to CWS for investment, but on 10 January, she signed a letter revoking the transfer, which had not yet occurred. Hurd did not inform CWS of the revocation. She met with Adams and Hansen again on 27 February and on 6 March, but did not transfer any funds to CWS. On 19 March, in a voicemail message, Hurd terminated her relationship with CWS.

CWS sent Hurd an invoice for $40,000, which she did not pay. CWS then brought this action against her, alleging breach of contract, promissory estoppel, and unjust enrichment. Mediation failed to resolve the matter. Hurd filed a complaint about CWS with the Better Business Bureau (BBB), which told her that BBB was not the proper agency and directed her to file her complaint with the Minnesota Department of Commerce (DOC) (DOC complaint). She also discussed the CWS situation with her former financial planner and with a friend.

CWS became aware of the DOC complaint during Hurd's deposition and successfully moved to amend its complaint by adding counts of defamation and interference with business (retaliation) based on five new paragraphs of factual allegations pertaining to Hurd's filing of the DOC complaint. Only one of them, paragraph 31, provides actual quotations of the allegedly defamatory statements, all taken from Hurd's DOC complaint. They include statements that: (1) Hurd "told [CWS] 'over and over again that she did not feel comfortable'"; (2) "[Hurd] falsely stated that [CWS] 'lied about their firm and its management not having been involved in any legal or

3

disciplinary events related to past or present clients'"; and (3) Hurd referred to "'the unprofessional and unethical actions'" of Hansen and Adams.

The other added paragraphs did not quote any allegedly defamatory language: (1) paragraph 28 indicated that, after being served with its complaint, Hurd discussed CWS and the lawsuit with her friend and her financial advisor; (2) paragraph 29 indicated that the friend told Hurd that she should perhaps contact BBB; (3) paragraph 30 indicated that Hurd "published false statements of fact . . . and made complaints . . . concerning [CWS's] treatment of her" to BBB, DOC, and FINRA; and (4) paragraph 32 indicated that Hurd's statements were made in response to CWS's lawsuit.

Hurd moved for summary judgment, seeking: (1) the dismissal of CWS's defamation and interference-with-business claims under Minn. Stat. §§ 554.01-.05 (2014) (the statute prohibiting strategic lawsuits against public participation, known as the anti-SLAPP statute) because these claims are related to the DOC complaint; (2) the dismissal of CWS's breach-of-contract, promissory-estoppel, and unjust-enrichment claims; and (3) attorney fees under the anti-SLAPP statute.[1] The district court granted Hurd's summary-judgment motion, dismissed CWS's complaint, and awarded Hurd attorney fees under the anti-SLAPP statute.

CWS challenges the dismissal of its claims and the award of attorney fees.

---

[1] Hurd also moved for attorney fees under Minn. R. Civ. P. 11; this motion was denied, and she does not challenge the denial.

4

**D E C I S I O N**

## 1. Dismissal of claims under the anti-SLAPP statute.

Whether the anti-SLAPP statute applies is a legal question of statutory interpretation and is reviewed de novo. *Middle-Snake-Tamarac Rivers Watershed Dist. v. Stengrim*, 784 N.W.2d 834, 840 (Minn. 2010). A strategic lawsuit against public participation, or SLAPP, is a lawsuit initiated either to prevent citizens from exercising their political rights or to punish them for having done so. *Id.* at 838 (interpreting the anti-SLAPP statute).

> [T]he first step in evaluating an anti-SLAPP motion is to determine whether the party seeking dismissal under the anti-SLAPP statutes has made a threshold showing that the underlying claim materially relates to an act of the moving party that involves public participation . . . .

*Leiendecker v. Asian Women United of Minnesota*, 848 N.W.2d 224, 229 (Minn. 2014) (citing Minn. Stat. § 554.02, subd. 1, and holding that allegations in a complaint do not meet the requirement that the responding party produce clear and convincing evidence that the moving party is not entitled to immunity) (quotations omitted), *as modified*, 855 N.W.2d 233 (Minn. 3 Sept. 2014).

Thus, we must first determine whether Hurd has made a threshold showing that CWS's defamation and interference-with-business claims materially relate to an act of Hurd involving "public participation," defined as "speech or lawful conduct that is genuinely aimed in whole or in part at procuring favorable government action." Minn. Stat. § 554.01, subd. 6. CWS bases its claims primarily on Hurd's DOC complaint, which stated that DOC should no longer license Hansen and Adams to do business in

5

Minnesota. The complaint was aimed at procuring favorable government action—i.e., removing the licenses of Hansen and Adams—and was therefore an act involving public participation. CWS's defamation and interference-with-business claims materially relate to the DOC complaint, so Hurd has made the threshold showing required by step one.

> [T]he second step [in evaluating an anti-SLAPP motion] is to determine whether the party responding to the motion has produced clear and convincing evidence that the moving party is not entitled to immunity. Minn. Stat. § 554.02, subd. 2(3). The responding party can so do by establishing that [1] the moving party's conduct or speech was not aimed in whole or in part at procuring favorable government action, [2] that the conduct or speech constituted a tort, or [3] that the conduct or speech violated another's constitutional rights. Minn. Stat. § 554.03.

*Leiendecker*, 848 N.W.2d at 229. CWS argues the second alternative, i.e., that Hurd's statements were tortious because they were defamatory.

A defamatory statement must be false, must be communicated to a third party, and must harm the plaintiff's reputation. *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009). Specifically, CWS claims that four of the statements in Hurd's DOC complaint were false.

First, Hurd's DOC complaint said that CWS "lied [to Hurd] about their firm and its management not having been involved in any legal or disciplinary events related to past or present clients." During his deposition, Hansen was asked if at any time he had told Hurd that his license to sell securities had been suspended; he answered, "Not to my knowledge." He later said his suspension "wasn't germane" to what CWS was doing for Hurd and replied "Not that I'm aware of" when asked if, in any of the documents he

6

provided to Hurd, his suspension was disclosed. Thus, Hansen's own testimony demonstrates that Hurd's statement that his suspension was not disclosed to her was true.[2]

Second, the DOC complaint indicated that "while [Hansen's name was] on the contract that was signed on December 27, 2012, Mr. Hansen was not registered with F[INRA] as he had been suspended for three months." CWS claims that, in the DOC complaint, Hurd "stated . . . that CWS illegally signed the contract with her because . . . Hansen was suspended." But the DOC complaint, which does not contain the word "illegal," did not say that: it made only the undisputed statement that Hansen was suspended when he signed the contract with Hurd.

Third, the DOC complaint referred to "unethical actions" of Hansen and Adams. Hurd's belief that their actions were unethical is a statement of opinion, not a false statement of fact, and therefore cannot be defamatory. *See e.g.*, *Metge v. Cent. Neighborhood Improvement Ass'n*, 649 N.W.2d 488, 498 (Minn. App. 2002) (affirming conclusion that statements of mere opinion cannot be defamatory), *review dismissed* (Minn. 15 Oct. 2002). Nor does Hurd's reference to "unethical actions" display the "actual malice" needed to defeat the qualified privilege accorded to statements "made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause." *Bauer v. State*, 511 N.W.2d 447, 449 (Minn. 1994).

---

[2] After his deposition, Hansen produced an affidavit saying he had disclosed the suspension to Hurd, but, as the district court noted, "[a] self-serving affidavit that contradicts earlier damaging deposition testimony is not sufficient to create a general issue of material fact," *Banbury v. Omnitriton Int'l, Inc.*, 533 N.W.2d 876, 881 (Minn. App. 1995), and such an affidavit is not the "clear and convincing evidence" required by Minn. Stat. § 554.02, subd. 2(3).

Fourth, Hurd's DOC complaint said "the last issue I feel should be checked into is that it was not disclosed to me that I would have a $60,000 tax bill if I had invested with Adams/Hansen." CWS did not provide any factual evidence either that its investment strategy would not have resulted in this tax liability for Hurd or that Hurd was told of her tax liability under CWS's investment plan. While Hansen in his affidavit says that, in regard to the tax issue, the DOC complaint "intentionally misrepresents the truth, turning a great piece of work into a show of incompetence," he provides no accounting or other factual support for this statement, and the statement does not meet the "clear and convincing evidence" standard required by Minn. Stat. § 554.02, subd. 2(3). CWS has not shown that any of the statements in Hurd's DOC complaint is false or defamatory.

CWS also argues that Hurd made the defamation claims based on statements to entities other than DOC, i.e., BBB, her former financial planner, and a friend, and should not have been dismissed under the anti-SLAPP statute because the statements were not made to governmental entities. But a party alleging defamation must plead "specific alleged defamatory words." *Stead-Bowers v. Langley*, 636 N.W.2d 334, 342 (Minn. App. 2001) (citing *American Book Co. v. Kingdom Publishing Co.*, 71 Minn. 363, 366, 73 N.W. 1089, 1090 (1898)), *review denied* (Minn. 19 Feb. 2002). CWS's amended complaint quotes only language from the DOC complaint; it does not quote any specific alleged defamatory words written or spoken by Hurd to BBB, her financial advisor, or her friend. Therefore, the defamation claims based on statements made to these entities

8

fail. Having concluded that the DOC complaint was not defamatory, the district court did not err in dismissing CWS's defamation claim under the anti-SLAPP statute.[3]

The anti-SLAPP statute also provides that "[t]he court *shall* award a moving party who prevails in a motion under this chapter reasonable attorney fees and costs associated with the bringing of the motion."[4]  Minn. Stat. § 554.04, subd. 1 (emphasis added).  The canons of statutory construction indicate that "shall" is mandatory.  Minn. Stat. § 645.44, subd. 16 (2014).

The district court awarded Hurd 40% of her attorney fees, or $10,668, based on its finding that CWS made five claims against Hurd and that, while it was impossible to discover which fees were incurred in opposing the two claims dismissed under the anti-SLAPP claims, it was reasonable to assume that two of five claims would result in 40% of the fees.  CWS does not dispute this calculation.

The district court, having dismissed two claims under the anti-SLAPP statute, had no choice but to award attorney fees that Hurd incurred in opposing those claims. Analogously, because we affirm the dismissal, we affirm the attorney-fee award.

## 2.    Dismissal of the breach-of-contract and tort claims.

The Consulting Services Agreement (CSA) provided that CWS would be entitled to 4% of any deposit Hurd made with CWS and that Hurd had "read and underst[ood] the

---

[3] CWS does not dispute the district court's conclusion that, if its defamation claim fails, its interference-with-business claim fails because that tort requires interference that is "either independently tortious or in violation of a state or federal statute or regulation." *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). No violation is alleged.

[4] Hurd states in her brief that she will file the appropriate motion for Minn. Stat. § 554 appellate fees when this court releases its decision.

9

[Investment Advisory Agreement (IAA)] which is incorporated as an integral part of this program and . . . agree[d] to the terms as set forth in such Agreement. . . ." The IAA in turn told Hurd: (1) "You may at any time increase or decrease your managed assets"; (2) "[You] understand[] that [you] are under no obligation to implement any investment or insurance transaction through CWS"; and (3) "This agreement may be modified upon such terms as may be mutually agreed upon in writing."[5] CWS argues that it is entitled to $40,000 under the terms of these agreements and that Hurd breached them by refusing to pay that amount. The district court granted summary judgment dismissing CWS's breach-of-contract claim, concluding that there was no breach because "(1) CWS's fee was to be a percentage of Hurd's deposits, (2) Hurd was not obligated to make any deposits, and (3) Hurd in fact made no deposits."

"We review a district court's summary judgment decision de novo. In doing so, we determine whether the district court properly applied the law and whether there are genuine issues of material fact that preclude summary judgment." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010) (citation omitted).

CWS argues that Hurd admitted that she breached the agreement. CWS supports this argument with a statement from Hansen's affidavit that, after Hurd was told she still owed CWS its fee and that the fee would be more tax efficient if Hurd continued with the

---

[5] CWS argues that the CSA and IAA should be read independently from each other and that language in the IAA entitling Hurd to rescind the transfer of her funds did not preclude her breaching the CSA when she did rescind. But the two documents clearly relate to each other; neither can be construed without the other.

CWS investment plan, Hurd said "'that's the price I have to pay for my indecision' or something very close to that." But Hansen's affidavit indicates that he could not recall exactly what Hurd said, and the IAA clearly states that Hurd was "under no obligation to implement any investment . . . through CWS" and had the right "at any time . . . [to] decrease [her CWS-]managed assets." The IAA was never modified. There is no genuine issue of material fact as to whether Hurd breached the IAA or the CSA by rescinding her transfer of funds to CWS, and nothing in the language of either the CSA or the IAA supports a finding of breach.

CWS also argues that Hurd breached the CSA's implied covenant of good faith and fair dealing, *see In re Hennepin Cnty., 1986 Recycling Bond Litig*., 540 N.W.2d 494, 502 (Minn. 1995) (noting that every contract includes an implied covenant of good faith and fair dealing), because she "unjustifiably hinder[ed]" CWS's function when she revoked the transfer of her funds. But Hurd did not hinder CWS's function in investing any other funds: she simply decided not to invest her funds with CWS, as she was entitled to do under the contracts drawn up by CWS.[6] The summary judgment dismissing CWS's breach-of-contract claim was not erroneous.

The district court went on to dismiss the promissory-estoppel claim and the unjust-enrichment claim because neither of them can exist when the parties' relationship is contractual, and CWS's relationship with Hurd was based on its contracts. CWS argues

---

[6] If those contracts were ambiguous, they would be construed against CWS. *See Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979) ("Where there are ambiguous terms or the intent is doubtful, it is axiomatic that the contract will be construed against the drafter.").

that Hurd demanded additional planning services not provided by the contract, but, assuming that to be true, CWS did not tell Hurd either that it had no obligation to provide such services or that there would be a charge for the services. Nor does CWS explain how Hurd was enriched by the services it provided: it is undisputed that CWS never invested any of Hurd's funds.

No genuine issue of material fact precludes the summary judgment on these claims, and Hurd was entitled to judgment dismissing them as a matter of law.

**Affirmed.**