Barry SMITH, Plaintiff,

v.

A POCONO COUNTRY PLACE PROPERTY OWNERS ASSOCIATION, INC., Lou Cardilla, Antonio D'Erasmo, William Cetta, Angelo DiGiovanni, Carmella McGrath and Ray Bender, Defendants.

Civ. No. 85–0569.

United States District Court, M.D. Pennsylvania.

Dec. 3, 1987.

Joseph A. Quinn, Jr., David W. Saba, Hourigan, Kluger, Spohrer & Quinn, Wilkes-Barre, Pa., for plaintiff.

Joseph A. Murphy, Tellie, Diurkin, Weinberger, Murphy & Piazza, P.C., Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Plaintiff filed a Complaint on April 25, 1985 against defendants alleging breach of contract and defamation. Presently before the court is defendant's Motion for Summary Judgment. For the reasons set forth below, the court will deny defendants' Motion for Summary Judgment.

## FACTUAL BACKGROUND

In his Complaint, plaintiff alleges that he was employed by Defendant A Pocono Country Place Property Owners Association (Association) as General Manager of a residential property development known as "A Pocono Country Place." Plaintiff alleges that on April 28, 1984, the Association, by and through its President and Board of Directors, breached a written employment agreement with plaintiff. Damages as a result of this alleged breach of contract are sought.

In addition, plaintiff avers that on April 29, 1984, the day after his employment contract allegedly was breached, the Association, by and through the individual de-

fendants, and the individual defendants in their own rights, published and circulated a document entitled "Pocono Country Place Special Issue Newsletter Bulletin." Plaintiff maintains that defendants falsely, maliciously, wickedly, illegally and/or negligently printed and published the newsletter containing statements of and concerning plaintiff and reflecting upon his character. Defendants maintain that plaintiff was a public official or a public figure at the time of the alleged publication and, as such, plaintiff bears the burden of proving that defendants acted with actual malice. Alternatively, defendants argue that plaintiff was a limited purpose public figure who voluntarily injected himself into a particular public controversy and, therefore, became a limited purpose public figure who bears the same burden of showing actual malice. It is defendant's position that plaintiff cannot meet his burden of showing by clear and convincing evidence that each defendant realized at the time of publication that the statement was false or that each defendant subjectively entertained serious doubts as to the truth of the statements.[1]

## DISCUSSION

Our Court of Appeals repeatedly has noted that although a defamation suit has profound First Amendment implications, it is fundamentally a state cause of action. *See McDowell v. Paiewonsky*, 769 F.2d 942, 945 (3d Cir.1985). Adjudicating defamation claims requires inquiries under both state and federal law. *Id.* In the first instance, the court must determine whether the defendant has injured the plaintiff's reputation under the applicable state law. *Id.* If so, then the court must ascertain whether the First Amendment nevertheless prohibits the imposition of liability. *Id.* In defendants' motion, they raise issues concerning only the First Amendment, *i.e.*, that plaintiff was a public official/public figure/limited purpose public figure and that plaintiff failed to meet his burden of showing actual malice. Con-

---

1. Defendants do not challenge in this motion plaintiff's breach of contract claim. According- ly, the court addresses only the claim for defamation.

sequently, the court will not discuss at this juncture whether the published material is defamatory so as to injure plaintiff's reputation under applicable state law.

## I.

■ Initially, although not discussed in detail by the parties, *see* Document 63 of the Record at ¶ 8, the court must consider whether the actual malice standard of proof set forth in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) can apply to the non-media defendants in this case. The United States Supreme Court recognized that it had never decided the question of whether the *New York Times* standard applies to individual defendants as opposed to a media defendant. *Hutchinson v. Proxmire,* 443 U.S. 111, 133–34 n. 16, 99 S.Ct. 2675, 2687 n. 16, 61 L.Ed.2d 411 (1979). *See also Avins v. White,* 627 F.2d 637 (3d Cir.1980), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (*New York Times* privilege extended to private individual criticizing a public figure in the course of commenting on matters germane to accreditation of law school; court did not consider whether *New York Times* privilege extends to *all* private individuals regardless of the context in which the alleged defamatory statement is uttered). In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 781, 105 S.Ct. 2939, 2957, 86 L.Ed.2d 593 (1985), Justice Brennan, responding to an argument that the guidelines set forth in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), be limited to cases in which the defendant is a "media" entity, stated that such a distinction is irreconcilable with the fundamental First Amendment principle that the inherent worth of speech in terms of its capacity for informing the public does not depend upon the identity of its source. *Id.* 472 U.S. at 781, 105 S.Ct. at 2957 (citation omitted) (Brennan, J., dissenting). Moreover, Justice Brennan stated:

> Accordingly, at least six Members of this Court (the four who join this opinion and JUSTICE WHITE and THE CHIEF JUSTICE) agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities.[2]

*Id.* at 783–84, 105 S.Ct. at 2959 (citation omitted) (footnote omitted) (footnote not in original).

In *Garcia v. Board of Educ.,* 777 F.2d 1403, 1410 (10th Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986), the court adopted this reasoning and held "[F]irst amendment protection should not depend on whether that criticism is in the form of speech by a private individual or publication by the institutional press." Similarly, then District Judge Becker previously reached the conclusion that a non-media defendant is entitled to the benefit of the *New York Times* standard of proof. *Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254, 265–66 n. 20 (E.D. Pa.1977), *aff'd,* 595 F.2d 1265 (3d Cir.1979). *See Woy v. Turner,* 533 F.Supp. 102 (N.D. Ga.1981); *Fram v. Yellow Cab Co.,* 380 F.Supp. 1314, 1334 (W.D.Pa.1974). *See also Davis v. Schuchat,* 510 F.2d 731, 734 (D.C.Cir.1975) (understanding of *New York Times* and its offspring is that private persons and the press are equally protected by the requirement that false comment about public figures must be knowing or in reckless disregard of the truth in order to be actionable). Plaintiffs advance no reason why the *New York Times* standard should not apply in this case merely because defendants are not so-called media defendants. Thus, on the factual record present-

---

**2.** Justice Brennan was joined in his opinion by Justice Marshall, Justice Blackmun and Justice Stevens. Justice White, in a concurring opinion, stated that he agreed with Justice Brennan that the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech. *Id.* at 773, 105 S.Ct. at 2953. Then Chief Justice Burger implicitly rejected the media/non-media distinction since he agreed generally with Justice White's observations concerning *New York Times.* Finally, Justice Brennan noted that Justice Powell's opinion, in which now Chief Justice Rehnquist and Justice O'Connor joined, expressly declined to apply the media/non-media distinction to resolve the case, although this distinction was not expressly rejected. *Id.* at 784 n. 10, 105 S.Ct. at 2959 n. 10.

ed, the court finds that the *New York Times* standard may apply to the individual and corporate defendants in this case.

In considering a defamation case, the court is required to ascertain in the first instance whether the plaintiff is a public figure. *See Marcone v. Penthouse Int'l Magazine,* 754 F.2d 1072, 1081 (3d Cir. 1985), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985). "The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court." *Id.* at 1081 n. 4.[3]

## II.

■ Defendants first aver that plaintiff is a public *official.* Defendants cite cases which purportedly provide that one need not hold public office to be considered a public official. Plaintiff was the General Manager of the Association which consisted of approximately 2,050 property owners and defendants maintain that his position can be compared to that of a Mayor of a borough in Northeastern Pennsylvania. The court finds this argument unpersuasive.

In *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the United States Supreme Court stated "[i]t is clear, therefore, that the 'public official' designation applies at the very least *to those among the hierarchy of government employees* who have, or appear to the public to have, substantial responsibility for or control over the conduct of *governmental affairs." Id.* at 85, 86 S.Ct. at 676 (emphasis added) (footnote omitted). As the Court

indicated, there is a strong interest in debate on public issues and a similarly heightened interest in debate about those persons who are in a position significantly to influence the resolution of those issues. *Id.* For example, police officers qualify as public officials because they have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. *See Coughlin v. Westinghouse Broadcasting & Cable, Inc.,* 603 F.Supp. 377 (E.D.Pa.1985), *aff'd,* 780 F.2d 340 (3d Cir.1985), *cert. denied,* 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986).[4] In this case, plaintiff is in no way connected with a government agency. Plaintiff was the General Manager of a private property development and, hence, cannot be characterized as a public official. *Accord Gertz v. Robert Welch, Inc., supra* (at time of publication, plaintiff did not hold any remunerative governmental position; assertion that plaintiff was a public official has no basis).

## III.

Next, defendants maintain that plaintiff was a public *figure.* The United States Supreme Court has not provided a detailed analysis of the contours of the public and private figure categories. Instead, courts are left with the difficult task of determining the proper scope of the public figure doctrine. *See Marcone v. Penthouse Int'l Magazine, supra,* at 1082; Comment, *Defining a Public Controversy in the Constitutional Law of Defamation,* 69 Va.L. Rev. 931 (1983). In *Gertz v. Robert Welch, Inc., supra,* the court described two classes

---

**3.** As stated, the court will not address the initial inquiry of whether plaintiff has made a proper claim under state law. Defendants have not raised this issue in the Motion for Summary Judgment. The court notes, however, that to recover in a libel action under Pennsylvania law, plaintiff has the burden of proving:

(1) the defamatory character of the communication,
(2) its publication by the defendant,
(3) its application to the plaintiff,
(4) the understanding by the recipient of its defamatory meaning,
(5) the understanding by the recipient of it as intended to be applied to the plaintiff,

(6) special harm resulting to the plaintiff from its publication,
(7) abuse of a conditionally privileged occasion.

*Marcone v. Penthouse Int'l Magazine, supra,* at 1077–78; 42 Pa.Cons.Stat.Ann. § 8343(a) (Purdon 1982).

**4.** In its opinion, our Court of Appeals held that the district court correctly determined that the plaintiff was a public official and relied on the reasons expressed in the district court's opinion. *Id.* 780 F.2d at 342.

of public figures: all purpose public figures and limited purpose public figures. *Id.* at 351.

■ Defendants apparently first maintain that plaintiff was an all purpose public figure. A person becomes a public figure for all purposes and in all contexts when he achieves pervasive fame or notoriety. *Id.* The court finds that plaintiff did not assume a role of special prominence in the affairs of society so as to occupy a position of such persuasive power and influence that he could be deemed a public figure for all purposes. *See Hutchinson v. Proxmire, supra,* 443 U.S. at 134, 99 S.Ct. at 2687–88. Conceding that plaintiff may have been well known in the Monroe County area, the court does not believe that he possessed the fame and notoriety in the public eye necessary to make him a public figure for all purposes. *See Avins v. White, supra,* at 647.

### IV.

Finally, defendants aver that plaintiff was a limited purpose public figure in the circumstances of this case. This group of limited purpose public figures encompasses individuals who become involved in a public controversy and, thereby, become transformed into public figures only with regard to that particular controversy. *See McDowell v. Paiewonsky, supra,* at 947. In *Gertz v. Robert Welch, Inc., supra,* the United States Supreme Court explained that an individual who voluntarily injects himself or is drawn into a particular public controversy thereby becomes a public figure for a limited range of issues. *Id.* 418 U.S. at 351, 94 S.Ct. at 3012–13.

Our Court of Appeals has set forth a two-part inquiry for determining whether a defamation plaintiff is a limited purpose public figure. "The court must consider (1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy." *McDowell v. Paiewonsky, supra,* at 948 (citations omitted). Accordingly, the court first must determine whether a public controversy in fact existed.

■ Defendants maintain that the public controversy was a dispute over the membership on the Board of Directors of the Association. In support, defendants maintain that litigation concerning this dispute was instituted in Monroe County which litigation was ultimately settled in November 1983 and that a later suit was instituted in the United States District Court for the Middle District of Pennsylvania to force the United States Postal Service to deliver mail to one group of the directors or the other. Additionally, defendants aver that the dispute over the rightful directorship of the Association was widely reported in newspaper articles in Stroudsburg, Pennsylvania, and Scranton, Pennsylvania. The court agrees with defendants that the dispute concerning the composition of the Board of Directors of the Association is a public controversy for purposes of this defamation case. *Cf. Schiavone Constr. Co. v. Time, Inc.,* 619 F.Supp. 684, 703 (D.N.J. 1985) (issue of whether nominee to be Secretary of Labor of the United States is fit to serve and way in which FBI investigates such fitness is a public controversy of the highest order).

In *Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976), the United States Supreme Court refused to equate "public controversy" with all controversies of interest to the public. In that case, the Court found that dissolution of a marriage through judicial proceedings was not the sort of "public controversy" referred to in *Gertz,* even though those marital difficulties were of interest to some portion of the reading public.

As support for their position that the matter was a "public controversy," defendants attempt to establish that the dispute over the rightful membership of the Board of Directors of the Association "was widely covered by and reported on by the newspapers of Northeastern Pennsylvania including but not limited to the Pocono Record and the Scranton Times." *See* Document 72 of the Record, Affidavit of Lou Cardilla at ¶ 13. Defendants attach a newspaper article of the Pocono Record newspaper

dated May 1, 1984 entitled "Country Place Owners Again Fighting."

Concededly, while the controversy in question may not be of national or even state-wide importance, it is a public dispute of concern to residents of the local community, especially members of the Association. *See Lorain Journal Co. v. Milkovich,* 474 U.S. 953, 963, 106 S.Ct. 322, 323, 88 L.Ed.2d 305 (1985) (Brennan, J., dissenting). In *Milkovich,* Justice Brennan, with whom Justice Marshall joined in dissenting from the denial of *certiorari,* stated that a controversy involving a local high school wrestling coach was a public controversy of concern to residents of the local community, as important to them as larger events are to the nation. *Id.* 106 S.Ct. at 329. Justice Brennan found significant the fact that it was only in this community that the challenged article was circulated. *Id.* Similarly, in this case, the alleged defamatory material was published in newsletters specifically distributed to members of the Association. It is these Association members to whom the controversy involving the directorship is most prominent. Thus, as to the Association and the local community, the conflict over the proper directorship of the Association is a public controversy in that it affects a segment of the general public in an appreciable way.

■ The court must determine next whether plaintiff voluntarily injected himself into this "public controversy." The reasons given for distinguishing between public and private figures are as follows:

First, public officials and public figures have 'greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.' (citation omitted). Because private individuals have less access to effective self help, such individuals are more vulnerable to injury and the state has a correspondingly greater interest in protecting them.

More importantly, the court in *Gertz* stated that individuals who seek public office or who are public figures have assumed the risk that in the course of

reporting and commenting on a well known person or public controversy, the press may inadvertently make erroneous statements about them. Thus those individuals are less deserving of protection. (citations omitted).

*Marcone v. Penthouse Int'l Magazine, supra,* at 1081. A limited purpose public figure may voluntarily inject himself or be drawn into a particular public controversy thereby becoming a public figure for this limited range of issues. *Id.* at 1082.

In the typical limited purpose public figure case, plaintiff actively participates in the public issue in a manner intended to obtain attention. *Id.* at 1083. *See also Avins v. White, supra* (court must ask whether a reasonable person would have concluded that individual would play or was seeking to play a major role in determining the outcome of the controversy). With these definitions in mind, the court finds that plaintiff voluntarily injected himself into the public controversy.

In support of the contention that plaintiff voluntarily thrust himself into the controversy, defendants aver that plaintiff was openly critical of the settlement agreement entered into in November 1983 disposing of the action in Monroe County Court at the first meeting of the Board of Directors in 1983. Similarly, in March 1984, plaintiff purportedly compared one group of directors with a television program "The Dukes of Hazard" in the manager's section of the monthly newsletter distributed to members of the Association. A copy of the "Manager's Bulletin" included in the March 1984 newsletter was provided to the court. It is defendants' position that plaintiff authored this section of the bulletin.

The court finds that plaintiff's criticism of a settlement agreement concerning the proper directorship of the Association and his open criticism of one group of directors seeking control placed him in a position whereby he attempted to obtain attention in seeking to determine the outcome of the controversy. *Cf. Gertz v. Robert Welch, Inc., supra* (plaintiff never discussed litigation with the press and was never quoted as having done so; he did not engage the

public's attention in an attempt to influence the outcome). This finding is reinforced when the rationale behind the distinction between "private" and "public" plaintiffs is considered.

Plaintiff has demonstrated that he has access to channels of effective communication and, thus, has a more realistic opportunity to counteract false statements. As previously mentioned, plaintiff published statements in the Association newsletter which characterized one group of directors seeking control as the "Dukes of Hazard." While this publication in March 1984 appeared before the purported defamatory statements in April, 1984, plaintiff did acknowledge that accusations of wrongdoing on his part were being made. Although plaintiff is no longer employed by the Association, this does not negate his ability to utilize other sources of communication in a similar fashion.

Also, plaintiff's public criticism of the settlement agreement and these public statements concerning one group of directors leads to the conclusion that he assumed the risk that his character and/or background would be called into question by the group of directors he was criticizing. Thus, the court finds that this issue was a public controversy and that plaintiff voluntarily thrust himself into that controversy.

In relation to this issue, the court must determine if the alleged defamation was germane to plaintiff's participation in the controversy. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C.Cir. 1980), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). As the *Waldbaum* court held, "[m]isstatements wholly unrelated to the controversy, however, do not receive the *New York Times* protection." *Id.* at 1298. In so holding, however, the court recognized that the plaintiff's talents, education, experience and motives could be relevant to the public's decision whether to listen to him. *Id.* In examining the alleged defamatory material, the court finds that it is related to the controversy referred to by the defendants.

The publication in question primarily seeks to discredit the other group of directors and the allegations made against plaintiff seek to highlight the reasons why those other directors should be disbelieved. The purported defamatory material integrates the allegations against plaintiff with similar allegations against the group of directors in control so that the court concludes that the material is germane to the public controversy.

## V.

Because the court has found that plaintiff is a limited purpose public figure, he must prove that defendants' remarks were made with actual malice as prescribed in *New York Times Co. v. Sullivan, supra. See McDowell v. Paiewonsky, supra,* at 951. The actual malice standard requires that defendants make the defamatory remarks with "knowledge that the statement was false or with reckless disregard of whether it was false or not." *Id.* at 951. Reckless disregard for the truth means that defendants in fact entertained serious doubts as to the truth of the statement or that the defendants had a subjective awareness of probable falsity. *Id.* Recently, the United States Supreme Court stated:

When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Plaintiff avers that all of the Board of Directors of the Defendant Association met and reviewed the allegedly defamatory article. The essential defamatory statements in the article concern the allegation that plaintiff received a $40,000.00 kickback from Litts Corporation (Litts) and that plaintiff demanded a kickback from William Peterson (Peterson), but that this demand was refused.

Viewing the facts in a light most favorable to plaintiff reveals the following. Louis Cardilla's reason for authorizing publication concerning plaintiff's receipt of a $40,000.00 kickback from Litts as stated in his deposition was that he had heard from a workman of another firm who had been at a worksite about the $40,000.00 payment. As to the demand for a kickback from Peterson, Cardilla maintains that he reached this conclusion based upon information that his counsel, Attorney John Hiscott, had given him concerning a conversation Hiscott had with Attorney Marshall Anders, counsel for Peterson. Cardilla also avers that Hiscott obtained this information from Attorney Ralph Matergia, counsel for the Association, concerning his demand for a kickback.

Antonio D'Erasmo states that he believed the statments in the newsletter to be true and that he received this information from Attorney John Hiscott. Plaintiff maintains that the only support D'Erasmo had to indicate that the statements were true were statements made by other members of the Board.

William Cetta maintains that he was present when Hiscott prepared the newsletter. The source of Cetta's information was Attorney Hiscott.

Angelo DiGiovanni says only that he was aware of the allegations concerning plaintiff contained in the newsletter prior to its distribution. Although he was aware of the allegations, DiGiovanni states that he did not discuss the allegations concerning plaintiff with anyone before the newsletter was mailed. He did, however, hear that the source of the allegations was a Mr. Riley, the Association's accountant.

Raymond Bender reviewed the newsletter before it was mailed and he testified that Attorney Hiscott was the source of the information concerning plaintiff's $40,-000.00 kickback from Litts. Bender stated that Hiscott received information from Attorney Anders, counsel for Peterson, concerning the demand for a kickback from Peterson.

Bender was authorized by the entire board to talk with Peterson concerning the truth of the allegation that plaintiff demanded a kickback from Peterson. Bender attended a meeting with Peterson and others at which the kickback was discussed. At this meeting, Peterson denied the allegations concerning plaintiff's demand for a kickback and Bender testified that he believed Peterson when he stated that the allegations were not true. Bender stated that he brought Peterson's denial to the attention of the individual defendants before the newsletter was published. Of course, despite this information from Bender, the newsletter was still published.

Peterson testified that he recalled the meeting with Bender and corroborates Bender's testimony that Peterson told Bender that plaintiff never approached Peterson and asked him for a kickback. Peterson testified that he never told anyone that plaintiff ever asked him for a kickback. When another person subsequent to the Bender conversation asked Peterson about this alleged kickback, he became angry and sent a notarized statement to the Association attesting to the fact that he was never asked to pay any kickbacks.[5]

---

5. When this attestation was sent to the individual defendants is not clear. Apparently, plaintiff's replacement is the "other person" who questioned Peterson about kickbacks after Peterson's conversation with Bender. Document 56 of the Record, Deposition of William P. Peterson at 27. The attestation purportedly was sent a couple of months after plaintiff was terminated. *Id.* Thus, since the alleged defamation occurred immediately after plaintiff's termination, it appears that the individual de-

Similarly, James C. Litts, the owner of Litts, testified that he never paid any money to plaintiff. Litts stated that none of the defendants ever sought information from him concerning the allegation that he paid a kickback to plaintiff. Mr. Riley, a member of the accounting firm used by the Association, conducted an audit of the Association and he communicated to the Board the fact that the audit did not turn up any reasonable basis to believe the rumors being circulated about plaintiff and alleged kickbacks.[6]

Attorney Anders testified that he did not believe that he ever made a statement to anyone that plaintiff demanded or received kickbacks from Peterson. Anders averred that to the best of his recollection, he never confirmed either to Mr. Hiscott or Hiscott's partner that Peterson received a demand for a kickback from plaintiff.

Ralph A. Matergia, Esquire, testified that he first told Attorney Hiscott and Attorney William Robinson about the allegations against plaintiff. He contends that Attorney Anders told him that Peterson told Attorney Anders that Smith said something to the effect that if Peterson wanted to do business at the development that he first had to do business with Smith. In a second telephone call involving Attorney Anders, Attorney Matergia and Mr. Peterson, according to Matergia, Peterson told Attorney Matergia that Smith told Peterson that if Peterson wanted to do business with the Association he had to do business with Smith. Attorney Matergia testified that Attorney Hiscott told him that Attorney Anders and Peterson confirmed the information given to Attorney Matergia in the two telephone calls discussed. Matergia stated that in November of 1983 he received a telephone call from Donald Kessler who informed him that Peterson had told Kessler that plaintiff attempted to extract a kickback from Peterson. Kessler also told Matergia that he got the impression that plaintiff was involved in some way with a contract with Litts. Matergia

did state that he had a genuine concern over the legitimacy of the information that had been provided by Peterson in the telephone calls Matergia alleges he had with Anders and Peterson. Consequently, it appears that Matergia was the source of information conveyed to Hiscott, which information in turn was given to the individual defendants. Matergia claims to have gotten the information from Anders and Peterson. Both Anders and Peterson contradict the fact that they told Matergia about plaintiff's request for a kickback. Matergia was not consulted regarding publication of the kickback allegations and he testified at his deposition that he was opposed to any such publication.

Although defendants maintain that Peterson and James Litts' testimony is irrelevant, the court finds that Peterson's testimony that the Board was told that no kickback was demanded before publication of the newsletter is certainly relevant to defendants' state of mind. Similarly, James Litts' testimony that none of the defendants ever attempted to confirm the allegation of a kickback from him also may be relevant.

Our Court of Appeals has stated that a defendant's failure to verify his facts may constitute negligence, but does not rise to the level of actual malice. *See McDowell v. Paiewonsky, supra,* at 951. That is, while it arguably may be negligent not to check independently the veracity of information before publication, this fault does not rise to the level of actual malice. *Id.* Similarly, it does not appear that the allegations in this case would be so "inherently improbable" that defendants should be put on notice as to the possible falsity. *Id.* On the basis of the evidence, however, the court believes that more than defendants' failure to check their facts has been shown. Plaintiff has come forward with evidence tending to show that defendants were advised by Mr. Peterson through Mr. Bender prior to publication that the allegations concerning plaintiff were not true. While the de-

fendants received the attestation *after* publication of the purported defamatory material.

6. Whether Riley so informed the individual defendants before or after the April 29th publication apparently is disputed.

fendants may not have knowingly made a false statement, it is at least possible that they recklessly failed to ascertain the facts surrounding the alleged kickbacks. In situations such as this, our Court of Appeals stated "[w]e believe it is properly the task of the jury to weigh the evidence and we cannot say as a matter of law that Avins (plaintiff) cannot prove that White's (defendant) statements were made with actual malice." *See Avins v. White, supra,* at 650. While failure to investigate without more does not demonstrate actual malice, similarly, mere assertions that defendants thought the statement published was true and bare professions of good faith do not require a finding that actual malice does not exist. *See Marcone v. Penthouse Int'l Magazine, supra,* at 1089. Recklessness may be found where there are obvious reasons to doubt the veracity of the information or the accuracy of the reports. *Id.* As stated, in this case, the jury may find that the defendants were reckless in publishing the material after they were informed that the allegations were unfounded. *See also Schiavone Constr. Co. v. Time, Inc., supra,* at 708 (publishing with serious doubts as to the truth of a publication shows reckless disregard for truth or falsity and demonstrates actual malice; recovery is not precluded based solely upon defendant's belief that his or her statement was true; finder of fact must determine whether publication was indeed made in good faith).[7]

Malice cannot be inferred from general hostility towards, or bias against, the subject. *See Coughlin v. Westinghouse Broadcasting & Cable, Inc., supra.* Conversely, the absence of intent to defame does not shield the defendant from liability for defamation. *Id.* at 387. Thus, defend-

ants' purported ill feelings towards plaintiff do not support a finding that actual malice existed. Similarly, defendants' averments that they did not intend to publish false accusations concerning plaintiff do not preclude a finding of actual malice.

In sum, plaintiff has presented evidence that Peterson, the person who allegedly refused to give a kickback to plaintiff, conveyed to the Board before publication that no request for a kickback had ever been made by plaintiff. He later attested to this fact. Defendants' own witness, Mr. Matergia, testified that he had significant doubt as to the credibility of statements he attributed to Peterson and he advised the defendants that he, Matergia, had significant doubts as to the veracity of the statements he attributed to Peterson.[8] Of course, plaintiff attempts to show the Peterson denied the allegations and disputes that Peterson had these conversations with Matergia. With regard to the Litts kickback, while the fact that defendants did not check with Litts may not show actual malice, the court believes that there was no reasonable basis upon which to make these allegations. Accordingly, summary judgment will be denied.[9]

An appropriate Order will enter.

---

7. Defendants have not discussed the state of mind of Defendant Carmella McGrath and, consequently, the court has not discussed her participation in detail.

8. Again, it is not clear whether Matergia advised the individual defendants that he had serious doubts concerning the truthfulness of the allegations regarding plaintiff. In light of the standard applied to motions for summary judgment, the court finds that material factual disputes exist concerning defendants' state of mind.

9. The disposition of this summary judgment motion was held in abeyance pending receipt by the court of the deposition of Attorney Hiscott. That document was filed on November 6, 1987. Defendants then filed a supplemental memorandum in support of their motion for summary judgment on November 20, 1987. The court has reviewed these documents and finds nothing that would warrant a grant of summary judgment.