Debbie J. McINTYRE, d/b/a A Personal Touch Bookkeeping Services, Plaintiff–Appellee,

v.

George D. JONES, Defendant–Appellant.

No. 07CA0226.

Colorado Court of Appeals, Division III.

Sept. 4, 2008.

Debbie J. McIntyre, Pro Se.

Dufford, Waldeck, Milburn & Krohn, LLP, Nathan A. Keever, Wm. S. DeFord, Grand Junction, Colorado, for Defendant–Appellant.

Opinion by Judge J. JONES.

Defendant, George D. Jones, appeals the judgment entered against him following a trial to the court on plaintiff Debbie J. McIntyre's claim for defamation. We affirm.

## I. Background

At all relevant times, McIntyre and Jones were residents of a twenty-five-unit condominium complex in the Town of Mountain Village, Colorado. In 1996, the residents formed North Star B Condominium Association, Inc. (the Association), a nonprofit corporation, pursuant to the Colorado Common Interest Ownership Act, sections 38–33.3–101 to –319, C.R.S.2007, to regulate their rights and obligations vis-à-vis each other as unit owners.

In 2000, McIntyre was the manager of the Association, and was paid $200 per month to provide managerial services. She was also the bookkeeper for the Association, and was paid an additional $200 per month to provide bookkeeping services. At that time, the Association was governed by a three-member board of directors, consisting of Jones, Donn Wagner, and Heather George.

Sometime in mid to late 2000, Jones (and perhaps Wagner) became concerned whether McIntyre was adequately and competently fulfilling her responsibilities as manager and bookkeeper. The board members requested that McIntyre provide them with the financial records she kept on behalf of the Association; however, McIntyre, erroneously believing she could be supervised only by the Association president or treasurer, refused to provide the requested documents to the board. McIntyre similarly refused a second request for the documents made by the board.

In February 2001, Jones and Wagner met and discussed matters pertaining to McIntyre's performance. (George was not present at the meeting.) On February 27, 2001, Wagner sent McIntyre a letter informing her that "[e]ffective immediately we will no longer require your services as manager." The letter also demanded that McIntyre turn over to Wagner all "corporate records." The letter did not say why McIntyre was being terminated as manager, nor did it say anything about McIntyre's status as the Association's bookkeeper.

On March 14, 2001, McIntyre was given a letter of that date signed by Jones and Wagner (but not George) purporting to terminate her as "Accountant," and once again demanding that she turn over "all books and records of the Association" by the following day. However, there is conflicting evidence in the record as to whether the board actually terminated McIntyre as bookkeeper. For example, shortly after the date of the letter, Wagner instructed McIntyre to pay Association bills, a bookkeeping function, and George testified that the board did not vote to terminate McIntyre as bookkeeper. The trial court did not make a finding on that question. For our purposes, it is sufficient to note that the March 14, 2001 letter refers only to McIntyre's "unresponsiveness and insubordination" in refusing to turn over documents as a reason for purporting to terminate her as "Accountant."

McIntyre turned over records to Wagner on March 15 and 24, 2001.

On April 1, 2001, the annual meeting of the Association's members was held, at which the members elected George, Steve Schneider, and Tami Huntsman as board members; Jones and Wagner did not thereafter serve on the board. The new board met that same day, and unanimously voted to retain McIntyre as bookkeeper, so long as she became "bonded" by May 1, 2001. In addition, the board voted to require two signatures on all Association checks.

In a letter dated July 3, 2001, addressed to Huntsman, Jones requested that the board not use McIntyre as the Association's "accountant" "pending a full audit." Therein, Jones complained about a variety of matters, including the following:

- the Association had been required to pay $1,460.87 in bank service fees;
- McIntyre had not provided the board with an accounting of spending and reserves, as the board had been requesting for several months;
- certain "management" expenses for which McIntyre had sought reimbursement from the Association were "unreasonable," including amounts for water removal, lawn care, and work "expected of a manager" totaling $207.50 (which should have been covered by the $200 per month paid to McIntyre as manager);

- McIntyre had failed to change trash removal companies as instructed;
- McIntyre had failed to produce the Association books for review;
- McIntyre cashed a check in the amount of $857.50, drawn on the Association's account, that was made payable to her but not signed; and
- McIntyre failed to follow "normal procedures and safeguards" concerning bookkeeping matters (relating to unspecified incidents of "bypass[ing] the checking account signatories by giving herself credit against monthly dues and signing other checks").

McIntyre responded to Jones's allegations by providing information to the board. The board reviewed the Association's financial records, and concluded that while some of the overdraft charges were attributable to McIntyre's failure to timely transfer funds from the Association's savings account to its checking account, McIntyre had satisfactorily refuted Jones's other allegations. McIntyre and the board agreed that she would reimburse the Association for $350 in bank service charges. The board further concluded that it had "not seen evidence of fraud in any way." The board included its conclusions in the official minutes for its September 30, 2001 meeting, copies of which were sent to all Association members.

In the fall of 2001, McIntyre attempted to give Jones a letter demanding that he stop making false statements about her and her professional abilities, but was unsuccessful in doing so until January 27, 2002. Jones read the letter quickly, then handed it back to McIntyre, saying he did not want it.

McIntyre resigned as the Association's bookkeeper in June 2002. In November 2004, however, the board decided to look into hiring a different bookkeeper than the one it was using. McIntyre was one of the two applicants, and the board hired her. When Jones learned of that decision he sent a letter to the board, dated December 30, 2004. With respect to the board's decision to rehire McIntyre as bookkeeper, the letter stated:

> Dave [Doemland] also said Debbie McIntyre has been hired to do the accounting for the HOA. Three years ago the Board of Directors discharged Debbie McIntyre as Manager and Bookkeeper for incompetence, insubordination and withholding Condominium records and books from review. Upon review of the books we found she had inappropriately enriched herself from HOA funds. This is disturbing.

Nevertheless, the board decided to retain McIntyre as bookkeeper.

McIntyre subsequently filed this lawsuit against Jones, asserting a single claim for defamation based on the above-quoted portion of Jones's December 30, 2004 letter to the board. As relevant here, Jones denied that the statements were false and, as an affirmative defense, asserted that he had a qualified privilege to publish the statements. Jones later asserted that his statements involved a matter of public concern and that McIntyre was a limited purpose public figure, either of which, if true, would require McIntyre to meet a heightened burden of proof.

The case was tried to the court, which ruled in McIntyre's favor on her defamation claim, but awarded her only nominal damages of one dollar. In rendering its ruling, the court concluded: (1) the above-referenced statements in Jones's December 30, 2004 letter were false and defamatory; (2) the statements did not involve a matter of public concern; (3) McIntyre was not a limited purpose public figure when Jones published the statements; (4) Jones had a qualified privilege to make the statements but lost it because he published them with reckless disregard for their veracity; and (5) though McIntyre had not proved any actual damages, she was entitled to nominal damages because the statements were defamatory per se.

Jones appeals.

## II. Discussion

■ "In Colorado, the elements of a cause of action for defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or

the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court*, 866 P.2d 908, 911 n. 4 (Colo. 1993).

■ A common law cause of action for defamation exists to compensate individuals who have suffered harm to their reputations due to the careless or malicious communications of others. *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo.1994); *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 107, 538 P.2d 450, 462 (1975), *overruled on other grounds by Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103 (Colo.1982); *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 41 (Colo.App.1996). Protection of a person's reputation " 'reflects no more than our basic concept of the essential dignity and worth of every human being,' " and recognizes that once an individual's reputation is damaged, it is extremely difficult to restore. *Keohane*, 882 P.2d at 1297–98 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92–93, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring)); *see also Walker*, 188 Colo. at 107, 538 P.2d at 462.

■ The interest in protecting an individual's reputation is not paramount in all circumstances. It must be weighed against society's interest in encouraging and fostering vigorous public debate, an interest protected by the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution. *See Keohane*, 882 P.2d at 1298. Therefore, to account for the existence and importance of society's interest in free speech, the courts have imposed a number of modifications to the common law of defamation, several of which are at issue in this case.

■ Thus, for example, if a statement does not involve a matter of public concern or pertain to a public official or public figure, a plaintiff in a defamation action is required to prove the defendant's publication of a defamatory statement only by a preponderance of the evidence. If, however, the statement involves a matter of public concern or pertains to a public official or public figure, the plaintiff must prove the falsity of the statement by clear and convincing evidence.

*Smiley's Too, Inc.*, 935 P.2d at 41; *see Diversified Management, Inc.*, 653 P.2d at 1105–09. Likewise, the plaintiff in such a case must prove that the defendant published the statement with actual malice—that is, with actual knowledge that the statement is false or with reckless disregard for whether the statement is true; proof that the defendant was negligent in ascertaining the truth of the statement is insufficient. *Diversified Management, Inc.*, 653 P.2d at 1105–06; *Walker*, 188 Colo. at 98–99, 538 P.2d at 457; *Lewis v. McGraw–Hill Broadcasting Co., Inc.*, 832 P.2d 1118, 1121 (Colo.App.1992); *Seible v. Denver Post Corp.*, 782 P.2d 805, 808 (Colo. App.1989). And, a plaintiff in such a case must establish actual damages to maintain the action, even where the statement is defamatory per se. *Keohane*, 882 P.2d at 1304; *Rowe v. Metz*, 195 Colo. 424, 425–26, 579 P.2d 83, 84 (1978); *Walker*, 188 Colo. at 106, 538 P.2d at 462.

On appeal, Jones does not contest the trial court's finding that the statements at issue were defamatory. We observe that any such challenge would be futile. *See Gordon v. Boyles*, 99 P.3d 75, 79 (Colo.App.2004) (a statement is defamatory per se if, for example, it imputes a criminal offense or "a matter incompatible with the individual's business, trade, profession, or office"); *cf. Meehan v. Amax Oil & Gas, Inc.*, 796 F.Supp. 461, 466 (D.Colo.1992) (statements by company president that company controller had done a "bad" or "terrible" job in the areas of credit and collections were defamatory per se as a matter of law; applying Colorado law); *Pittman v. Larson Distributing Co.*, 724 P.2d 1379, 1387 (Colo. App.1986) (statements that employee was fired because he was not doing a good job and spent too much time on the telephone were defamatory per se as a matter of law).

He does, however, contest the trial court's findings that the statements did not involve a matter of public concern, McIntyre was not a limited purpose public figure, the statements were false, and he abused his qualified privilege to publish the statements. As noted above, the resolution of the first two of these issues impacts a plaintiff's burden of proof. Jones contends the trial court did not apply

the proper burden here, instead requiring McIntyre to prove her claim only by a preponderance of the evidence. Therefore, we address these two issues before turning to Jones's challenges to the sufficiency of the evidence of the falsity of the statements and the trial court's finding that he abused a qualified privilege to publish the statements.

### A. Matter of Public Concern

■■■■ The question whether a matter is of public concern is one of law, which we review de novo. *Walker,* 188 Colo. at 101–02, 538 P.2d at 459; *Williams v. Continental Airlines, Inc.,* 943 P.2d 10, 17 (Colo.App. 1996); *Lewis,* 832 P.2d at 1121.

> The boundaries of public concern cannot be readily defined, but must be determined on a case-by-case basis. Generally, a matter is of public concern whenever "it embraces an issue about which information is needed or is appropriate," or when "the public may reasonably be expected to have a legitimate interest in what is being published."

*Williams v. Continental Airlines, Inc.,* 943 P.2d at 17 (quoting in part Lewis, 832 P.2d at 1121). Somewhat more specifically, a matter is of public concern when "it can be fairly considered as relating to any matter of political, social, or other concern to the community," *Barrett v. Univ. of Colo. Health Sciences Center,* 851 P.2d 258, 263 (Colo.App.1993), or when it involves "the use of names, likenesses or facts in giving information to the public for purposes of education, amusement, or enlightenment when the public may reasonably be expected to have a legitimate interest in" the subject, *Lewis,* 832 P.2d at 1121; *see City of San Diego v. Roe,* 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (for First Amendment purposes, a matter is of public concern when it is "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication").

■■■■ In determining whether statements involve a matter of public concern, we must analyze "the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *Barrett,* 851 P.2d at 263; *accord Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion). "[T]he balance should be struck in favor of a private plaintiff if his or her reputation has been injured by a non-media defendant in a purely private context." *Williams v. Continental Airlines, Inc.,* 943 P.2d at 18; *accord Rowe,* 195 Colo. at 426, 579 P.2d at 84–85.

■■■■ This case involves a private plaintiff and a non-media defendant, and the allegedly defamatory statements were communicated in a purely private context—*i.e.,* in a letter to three members of a homeowners association board of directors. Jones does not contend that the statements were newsworthy or of legitimate interest to the public at large. Rather, he contends that the statements pertained to a matter of public concern because they related to the governance of a homeowners association, an entity he equates to the "public" or the "community." We are not persuaded.

Jones relies primarily on the California Court of Appeals' decision in *Damon v. Ocean Hills Journalism Club,* 85 Cal. App.4th 468, 102 Cal.Rptr.2d 205 (2000). That case, however, is readily distinguishable.

The relevant facts in *Damon* were that residents of a planned development residential community consisting of 1,633 homes (housing approximately 3,000 residents) and related amenities made statements during public board meetings and in the community newsletter critical of the community's general manager. The residents made the statements in the context of a dispute over whether to change the management of the community, which spilled over into an effort to recall two members of the board of directors. The court held that "because each of the allegedly defamatory statements concerned the manner in which a large residential community would be governed, they concerned 'issue[s] of public interest'" within the meaning of California's statute intended to prohibit litigation without merit filed to dissuade or punish others' exercise of their First Amendment rights (commonly referred

to as the "anti-SLAPP" statute). *Id.* at 209. In so holding, the court characterized the homeowners association board as a " 'quasi-governmental entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government,' " and placed great weight on "the number of individuals potentially affected by" the board's actions. *Id.* at 210 (quoting in part *Cohen v. Kite Hill Community Ass'n,* 142 Cal.App.3d 642, 191 Cal.Rptr. 209, 214 (1983)); *see also id.* at 212–13 (statements "concerned the very manner in which this group of more than 3,000 individuals would be governed—an inherently political question of vital importance to each individual and to the community as a whole"). The court defined "public interest" broadly to include "not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community similar to that of a governmental entity." *Id.* at 212.

In this case, in contrast, the statements did not concern governance of the Association. The Association is governed by an elected board of directors and managed by a manager selected by the board: the bookkeeper reports to the manager (and the treasurer) but does not engage in management functions. The bookkeeper is not selected by the members of the Association, and the bookkeeper's functions, unlike those of the board of directors and manager, are entirely ministerial.

Further, unlike the situation in *Damon,* the selection of a bookkeeper by the Association does not affect a large number of individuals. To the contrary, it affects a small number of individuals. The condominium complex has twenty-five units. Evidence introduced at trial revealed that six or seven of those units are owned by a single entity. One of the developers owns two units, and two other developers each own four units. Therefore, there are twelve or thirteen unit owners. This is a far cry from the 3,000 residents affected in *Damon.*

We observe that the California courts have regarded the court's holding in *Damon* as limited to matters of governance affecting a large number of individuals, consistent with *Damon*'s rationale that a matter of public

concern is one that affects a broad segment of the community or affects a community in a manner similar to that of a governmental entity. *See Ruiz v. Harbor View Community Ass'n,* 134 Cal.App.4th 1456, 37 Cal. Rptr.3d 133, 142–43 (2005) (statements concerning whether architectural guidelines were being enforced evenly by architectural committee of homeowners association governing 523 lots related to a matter of public interest); *Weinberg v. Feisel,* 110 Cal. App.4th 1122, 2 Cal.Rptr.3d 385, 392–93 (2003); *Du Charme v. Int'l Brotherhood of Electrical Workers,* 110 Cal.App.4th 107, 1 Cal.Rptr.3d 501, 507–10 (2003). Indeed, the California courts have not applied the holding in *Damon* to situations involving matters other than governance (or other issues of similarly broad affect and interest) or relatively small communities. *See, e.g., Darnell & Scrivner Architecture, Inc. v. Meadows Del Mar Homeowners Ass'n,* No. D051445, 2008 WL 2133190, at *9–10 (Cal.Ct.App. May 22, 2008) (homeowners association governed only twenty-two lots; matter did not concern association governance) (unpublished); *Palmia Master Ass'n v. Rufran,* No. G037850, 2007 WL 2122485, at *4–5 (Cal.Ct.App. July 25, 2007) (disciplinary action against a single member of a homeowners association was merely a private controversy) (unpublished); *Weinberg,* 2 Cal.Rptr.3d at 389–90, 393–94 (statements by one token collector accusing another token collector of theft which were published in letters to more than twenty collectors concerned "a private dispute between private parties"); *Du Charme,* 1 Cal. Rptr.3d at 506–10 (statement posted on local union chapter's Internet web site that assistant business manager had been terminated for "financial mismanagement" did not concern a matter of public interest because it was not published in the context of an ongoing controversy).

A few courts in other jurisdictions have regarded statements concerning governance of homeowners associations as involving matters of public interest under circumstances similar to those in *Damon. See Smith v. A Pocono Country Place Property Owners Ass'n, Inc.,* 686 F.Supp. 1053, 1054, 1057–58 (M.D.Pa.1987) (statements in homeowners

association bulletin concerning composition of board of directors was a "public controversy"; association consisted of approximately 2,050 property owners); *Gulrajaney v. Petricha*, 381 N.J.Super. 241, 885 A.2d 496, 500, 504–05 (Ct.App.Div.2005) (candidate for seat on board of directors of a condominium association was a public figure for purposes of defamation action; association managed more than 1,000 units housing approximately 2,500 residents); *Martin v. Committee for Honesty & Justice at Star Valley Ranch*, 101 P.3d 123, 126, 128–30 (Wyo.2004) (statements in bulletins mailed to homeowners association members and posted in public places criticizing board of directors member and advocating his recall over termination of the association's general manager concerned a public controversy; association consisted of approximately 2,000 lot owners); *but see Sewell v. Eubanks*, 181 Ga.App. 545, 352 S.E.2d 802, 803 (1987) (statements in document mailed to property owners belonging to 600–member association which concerned board of directors election did not concern a public controversy). But, Jones has cited no case, and we have not located any, holding that a matter akin to selecting a bookkeeper for a small homeowners association is a matter of public concern for purposes of a defamation action. For the reasons discussed above, we conclude that the statements at issue here did not involve a matter of public concern. *Cf. Williams v. Continental Airlines, Inc.*, 943 P.2d at 13–14, 17–18 (flight attendants' statements that pilot had attempted to sexually assault one of them did not involve a matter of public concern despite the size and nature of the company and the effect of the controversy on pilot's relationships with his coworkers).

## B. Limited Purpose Public Figure

■ We review de novo the question whether an individual is a limited purpose public figure. *See NBC Subsidiary (KCNC–TV), Inc. v. Living Will Center*, 879 P.2d 6, 11 (Colo.1994) (whether an alleged defamatory statement is constitutionally privileged is a question of law that the appellate court reviews de novo).

■ As noted, a plaintiff who is a "public figure" bears a heavier burden to recover in a defamation case than does a purely private individual. Jones does not contend that McIntyre is a public figure; that is, one who has "assumed [a] role[ ] of especial prominence in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Rather, he contends McIntyre is a "limited purpose public figure," and therefore bore a heavier burden with respect to the statements at issue here.

■ In *Gertz*, the Supreme Court recognized that a person may be a public figure for a limited purpose where that person "voluntarily injects himself or is drawn into a particular public controversy," thereby "assum[ing] special prominence in the resolution of public questions." *Id.* at 351, 94 S.Ct. 2997. "Limited purpose public figure status focuses on two questions: the threshold question of whether the defamatory statement involves a matter of public concern and, more importantly, whether the level of plaintiff's participation in the controversy invites scrutiny." *Lewis*, 832 P.2d at 1122; *see Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 165–66 & n. 8, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

■ Jones's assertion that McIntyre is a limited purpose public figure falters on the threshold requirement that the statements involve a matter of public concern. As discussed in the foregoing section of this opinion, they did not. Therefore, we need not address his contention that McIntyre voluntarily injected herself into a public controversy by seeking to become the Association's bookkeeper.

## C. Falsity of the Statements

The district court found that Jones's statements in the December 30, 2004 letter were false in two respects: "McIntyre did not inappropriately enrich herself from [Association] funds; and the board never determined that she had inappropriately enriched herself from [Association] funds."

Case law is somewhat unclear whether, or in what circumstances, a plaintiff must prove

that the alleged defamatory statement is false or whether the truth of the statement is an affirmative defense to be proved by the defendant. *See Gordon,* 99 P.3d at 81 (holding that "[t]ruth is a complete defense to defamation"); *Williams v. Boyle,* 72 P.3d 392, 401 (Colo.App.2003) (same, but noting that there is a question "whether, in the absence of a qualified privilege, a plaintiff in a private defamation action may be required to show, as part of his or her prima facie case, that the statement was false"). The trial court here appears to have assumed McIntyre had the burden of proving that the statements were false, and Jones does not contend that the trial court required him to prove the statements were true. Because the trial court found that Jones had a qualified privilege to publish the statements, a finding from which McIntyre has not appealed, we, too, assume that McIntyre was required to prove that the statements were false. *See Williams v. Boyle,* 72 P.3d at 401.

There is also some question whether we review a determination that a statement is false for clear error because it is an issue of fact, or de novo because it is an issue of "constitutional fact" or law. *See NBC Subsidiary (KCNC–TV), Inc.,* 879 P.2d at 9–11 (issues pertaining to whether a statement is entitled to constitutional protection are reviewed de novo); *Walker,* 188 Colo. at 101, 538 P.2d at 459 ("questions of constitutional fact compel an appellate court's de novo review"); *Gomba v. McLaughlin,* 180 Colo. 232, 235–36, 504 P.2d 337, 338–39 (1972) (question whether a statement is true is a factual one); *Gordon,* 99 P.3d at 81 (same). Jones argues that we must review the trial court's finding de novo. We disagree.

An issue of "constitutional fact" is one which affects whether the statement is subject to constitutional protection. *See NBC Subsidiary (KCNC–TV), Inc.,* 879 P.2d at 9–11. Such issues include whether the statement involves a matter of public concern; whether the plaintiff is a public official, public figure, or limited purpose public figure; whether the statement constitutes protected opinion; and whether the defendant had a qualified privilege to publish the statement. *See, e.g., Keohane,* 882 P.2d at 1298–

99; *Diversified Management, Inc.,* 653 P.2d at 1105–09; *Smiley's Too, Inc.,* 935 P.2d at 41. First Amendment protections may be implicated depending on how these issues are decided: the burden of proof may be raised (from preponderance of the evidence to clear and convincing evidence) or the plaintiff may have to prove a greater degree of culpability on the defendant's part (such as whether the defendant acted with malice). *See Diversified Management, Inc.,* 653 P.2d at 1105–09; *Williams v. Boyle,* 72 P.3d at 400–01; *Smiley's Too, Inc.,* 935 P.2d at 41. A statement may not be actionable at all because of the constitutional protection accorded to certain matters of opinion (*i.e.,* statements which do not contain a provably false factual connotation or which cannot reasonably be interpreted as stating actual facts). *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Keohane,* 882 P.2d at 1298–99.

The answer to the question whether a statement is true, however, will not implicate constitutional protections. If the statement is true, it is not actionable irrespective of the First Amendment. If it is false, it is not entitled to First Amendment protection absent the presence of some additional "constitutional fact" of the type identified above. Therefore, the trial court's findings that the statements at issue here were false constitute findings of fact. *See Time, Inc. v. Hill,* 385 U.S. 374, 393–94 n. 11, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (in false light invasion of privacy action, question whether the evidence shows there was a knowing or reckless falsehood is for the jury, not the appellate court); *Maheu v. Hughes Tool Co.,* 569 F.2d 459, 464–65 (9th Cir.1977) (in common law defamation action, question of statement's falsity is one of fact for the fact finder to decide); *Nevada Independent Broadcasting Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337, 343 (1983) (same as *Maheu* ); Restatement (Second) of Torts § 617 (1977) (same as *Maheu* ).

We will set aside a trial court's findings of fact only if they are clearly erroneous and not supported by the record. *Gebhardt v. Gebhardt,* 198 Colo. 28, 30, 595 P.2d 1048, 1050 (1979); *People in Interest of*

*J.A.S.,* 160 P.3d 257, 260 (Colo.App.2007); *Reid v. Pyle,* 51 P.3d 1064, 1068 (Colo.App. 2002). In reviewing the trial court's findings that the statements were false, we bear in mind that, because the statements did not involve a matter of public concern and McIntyre is not a public figure (for a limited purpose or otherwise), she was required to prove that the statements were false only by a preponderance of the evidence. However, we also bear in mind that the statements need not have been literally true; if "the substance, the gist, [or] the sting" of the statements was true, McIntyre cannot prevail. *Gomba,* 180 Colo. at 236, 504 P.2d at 339; *accord Gordon,* 99 P.3d at 81.

Jones focuses on evidence which he contends shows that McIntyre paid herself twice for services performed in July 2000 and that she paid herself additional compensation for work included within her regular managerial duties. That evidence, however, was refuted by other evidence received at trial. Specifically, evidence showed that McIntyre had been paid twice in one month in 2000 to make up for a month in 1999 for which she had not been paid, and that the Association's treasurer had approved the additional compensation.

 Though Jones contends McIntyre did not present any evidence corroborating her testimony on these points, the trial court apparently found her testimony credible; corroboration was not required. In any event, Jones overlooks the following evidence introduced at trial: (1) Association bank statements and copies of checks for 1999 and 2000 do not show a check in 1999 to pay McIntyre for management and bookkeeping services for one month in the fall of 1999; and (2) the board investigated his allegations in 2001, and, with the exception of some bank service charges, which did not enrich McIntyre, found that his allegations were meritless.

There was also evidence showing that the board of which Jones was a member had not found that McIntyre had inappropriately enriched herself. The context of that statement in the December 30, 2004 letter indicates that Jones was referring to a determination made by the board when he served on it and was a reason the board terminated her as manager and bookkeeper. However, none of the board minutes and letters leading up to the board's decision to terminate McIntyre as manager or bookkeeper mentions any alleged inappropriate self-enrichment. Indeed, as Jones concedes, he and Wagner reviewed the Association's financial records and reached the conclusions subsequently expressed in Jones's December 30, 2004 letter when neither he nor Wagner was a member of the board of directors. His contention that the statement was true because he and Wagner had been members of the board is inconsistent with the reasonable understanding of the statement read in context.

In sum, we conclude that the trial court's findings that the statements were false are supported by evidence in the record, and were therefore not clearly erroneous.

D. Qualified "Common Interest" Privilege

 "A qualified privilege exists for communications by a party with a legitimate interest or duty to persons having a corresponding interest or duty in communications promoting legitimate individual, group, or public interests." *Williams v. Boyle,* 72 P.3d at 400; *accord Dominguez v. Babcock,* 727 P.2d 362, 365 (Colo.1986) (a privilege exists in matters of "common interest" to the maker of the statement and the one to whom it is communicated), *aff'g* 696 P.2d 338 (Colo.App. 1984). Where the qualified privilege exists, there is a presumption that the communication was made in good faith without malice. The plaintiff has the burden of rebutting that presumption, and may do so by proving that the defendant published the statement with malice; that is, knowing the statement is false or communicating it in reckless disregard for its veracity. *Dominguez,* 727 P.2d at 366; *Williams v. Boyle,* 72 P.3d at 401; *Pittman,* 724 P.2d at 1388–89. "Reckless disregard" in this context means " 'a high degree of awareness for probable falsity or serious doubt as to the truth of the statement.' " *Dominguez,* 727 P.2d at 366 (quoting Restatement (Second) of Torts § 600 (1977)).

 The determination whether a qualified "common interest" privilege exists is a question of law; however, the determination whether the defendant acted with malice is a question of fact. *Dominguez,* 727 P.2d at

366; *Abrahamsen v. Mountain States Tel. & Tel. Co.,* 177 Colo. 422, 427, 494 P.2d 1287, 1289 (1972); *Williams v. Boyle,* 72 P.3d at 401.

Here, the trial court found that Jones had a qualified privilege to publish the statements, but that he had abused the privilege, and therefore lost it, because he "acted with reckless disregard for the truth by failing to investigate fully the facts, including the results of the board's investigation regarding McIntyre." The court also found that Jones "was more interested in convincing the board not to hire McIntyre than he was in knowing the truth."

■ We agree with the trial court's ruling that Jones was entitled to a qualified privilege. (McIntyre has never contended otherwise.) Jones challenges the trial court's ruling that he abused the privilege. We conclude that the trial court's finding is supported by evidence, and is therefore not clearly erroneous.

Neither Jones nor Wagner had any accounting expertise, and they did not seek assistance from anyone with such expertise when they reviewed the Association's financial records. Jones admitted at trial that he did not review records from 1999 during his investigation, though he had them. He also testified that there was no way of knowing whether McIntyre had overpaid herself without an audit being conducted by an accountant; yet, the absence of such an audit did not deter him from alleging that McIntyre had overpaid herself.

Jones brought his allegations to the board's attention in July, 2001. The minutes of the September 30, 2001 board meeting, which indicated that the board had investigated those allegations and found no evidence of self-dealing on McIntyre's part, were sent to him. (Testimony established that board minutes were sent to all Association members.) Jones did not follow up with the board to determine the bases of the board's conclusions. In early 2002, McIntyre gave Jones a letter demanding that he stop making false accusations against her, but after reading it over briefly, Jones handed it back to her saying he did not want it. These facts, and reasonable inferences that could be drawn therefrom, show, at the very least, that Jones deliberately chose not to learn the relevant facts.

Nonetheless, Jones contends that because the trial court found he had acted in good faith and believed the statements to be true, he could not have acted with reckless disregard. It is clear, however, that the court's finding to that effect was, in essence, a conclusion that Jones did not have actual knowledge that the statements were false. That finding did not preclude a finding that he acted with reckless disregard for the veracity of the statements.

It is also clear that, contrary to Jones's contention, the court did not find he had been merely negligent in failing to investigate after he made his allegations in 2001. *See Dominguez,* 696 P.2d at 342 (mere negligence in investigating facts is insufficient, without more, to show actual malice). Rather, the court concluded that Jones willfully chose not to learn the truth. ("Jones was more interested in convincing the board not to hire McIntyre than he was in knowing the truth.") As discussed above, that conclusion is supported by evidence in the record. It is sufficient to establish reckless disregard. *Cf. Kuhn v. Tribune–Republican Publ'g Co.,* 637 P.2d 315, 319 (Colo.1981) ("Actual malice may be inferred by the finder of fact if an investigation is grossly inadequate.").

### III. McIntyre's Request for Attorney Fees and Costs

■ McIntyre requests that she "be reimbursed for all the additional costs and reasonable attorneys fees" she has incurred on appeal. However, she cites no basis for an award of attorney fees and none is apparent to us. Moreover, because McIntyre has represented herself on appeal, she has not incurred any potentially recoverable attorney fees. Accordingly, we deny McIntyre's request for attorney fees. However, we grant McIntyre's request for costs. *See* C.A.R. 39.

The judgment is affirmed.

Judge CASEBOLT and Judge RUSSEL concur.