The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 30, 2023

**2023COA114**

**No. 22CA1611, *Tender Care v. Barnett* — Torts — Defamation; Courts and Court Procedure — Action Involving Exercise of Constitutional Rights — Anti-SLAPP — Special Motion to Dismiss — Issue of Public Interest — Public Issue**

In this defamation action, a division of the court of appeals considers whether an online review of a veterinary clinic was made in connection with an issue of public interest such that it is subject to the protections of Colorado's anti-SLAPP statute, § 13-20-1101, C.R.S. 2023. Recognizing that a private dispute concerning the quality of veterinary services may implicate a public interest, the division determines that (1) there must be some nexus between the challenged statements and the issue of public interest; (2) labelling speech a "warning" does not automatically warrant protection

under the anti-SLAPP statute; and (3) such protection is not warranted where protected statements are merely incidental to unprotected conduct.

Examining the entire context of the statements made here — including the speaker, audience, purpose, and content — the division concludes that statements made primarily for the purpose of airing a private dispute, and that are merely incidental to any protected conduct, are not protected by the anti-SLAPP statute.

Consequently, the division affirms the district court's decision denying a special motion to dismiss the action.

COLORADO COURT OF APPEALS                                    **2023COA114**

---

Court of Appeals No. 22CA1611
El Paso County District Court No. 22CV30676
Honorable David Prince, Judge

---

Tender Care Veterinary Center, Inc.,

Plaintiff Counterclaim Defendant-Appellee,

v.

Jennifer Lind-Barnett and Julie Davis,

Defendants Counterclaimants-Appellants.

---

ORDER AFFIRMED

Division I
Opinion by JUDGE DAILEY
Dunn and Harris, JJ., concur

Announced November 30, 2023

---

Relevant Law, Tanner W. Havens, Colorado Springs, Colorado, for Plaintiff
Counterclaim Defendant-Appellee

Kane Law Firm, P.C., Mark H. Kane, Colorado Springs, Colorado; Law Office of
Steven D. Zansberg, LLC, Steven D. Zansberg, Denver, Colorado, for
Defendants Counterclaimants-Appellants

¶ 1     Defendants, Jennifer Lind-Barnett and Julie Davis, filed a special motion to dismiss defamation claims brought by plaintiff, Tender Care Veterinary Center, Inc. (Tender Care), pursuant to Colorado's anti-SLAPP statute, section 13-20-1101, C.R.S. 2023. The district court denied their motion, and they now appeal. We affirm.

## I.     Background

¶ 2     According to Tender Care's complaint, in January 2022, Lind-Barnett brought her puppy, Pinkerbell, to Tender Care for emergency veterinary services; a vet examined the puppy and released her back to Lind-Barnett's care. When the puppy did not appear better, Lind-Barnett administered her own treatment to the puppy at home. The next morning, she brought the puppy to a different vet clinic, where the dog was diagnosed with pneumonia and successfully treated. Several days later, Lind-Barnett contacted Tender Care to inform it that it had improperly treated her puppy. Tender Care initiated a review of the puppy's treatment and, after determining that the puppy had received the requisite standard of care, refused Lind-Barnett's request for a refund.

¶ 3    In March 2022, Davis took her dog, Spicy, to Tender Care for ataxia, or difficulty walking and balancing.  After an examination and bloodwork, Tender Care diagnosed the dog with a resolved seizure.  Davis took her dog home, and when the dog continued to have symptoms overnight, Davis brought her to a different vet clinic, where the dog was diagnosed with vestibular disease and treated.

¶ 4    In February and March 2022 — after Tender Care declined Lind-Barnett's refund request — Lind-Barnett posted six online reviews about her experience with Tender Care on her personal Facebook page, Tender Care's Facebook page, and four different community-based Facebook pages.[1]

¶ 5    In March 2022, Davis responded to several of Lind-Barnett's posts with similar posts about the adequacy of care her pet received at Tender Care and Tender Care's business practices.

---

[1] Tender Care's practice is in Falcon, Colorado.  Lind-Barnett posted her comments on the Black Forest Community Facebook Page; the Falcon, Peyton, Calhan, Black Forest and Surrounding Areas Community Facebook Page; the Calhan, CO and Surrounding Areas Community Facebook Page; and the Neighborhood Network of Black Forest and Surrounding Areas Community Facebook Page.

¶ 6    In their posts, defendants asserted, among other things, that Tender Care was guilty of professional "malpractice"; that it employs "incompetent," "inept," and "less than adequate" doctors and staff who are "ignoran[t]" and "dishonest," "lack training[ and] misdiagnose," and repeatedly commit "malpractice"; that Tender Care has numerous "complaints" filed against it "with the labor board"; that Tender Care allowed and encouraged "covid positive employees to come into work"; that "dozens of others" have "post[ed]" that the Tender Care owner's "elderly father," a former lawyer, was used "to threaten people"; that Tender Care isn't "actually an emergency clinic" but "the biggest scam to ever walk into our town"; that Tender Care used "lies" and "intimidation," and "harassed," "threaten[ed]," and "bull[ied]" people; that Tender Care "refuse[d] to take responsibility for anything — especially their own ineptness"; and that Tender Care "blame[d] [its] client for their animal's illness just because they posted a bad review."

¶ 7    After defendants refused to remove their posts, Tender Care instituted the present action for defamation per se against each defendant, based on 104 of Lind-Barnett's statements and 10 of Davis's statements. Defendants responded, filing a special motion

3

to dismiss under Colorado's anti-SLAPP statute. After reviewing the parties' briefs and accompanying materials and holding a nonevidentiary hearing, the district court denied defendants' motion.

¶ 8 In its order, the court concluded that defendants had failed to establish that their statements addressed "matters of public interest or a public issue," and that, consequently, the matter did not fall within the protections of the anti-SLAPP statute:

> The statements described in the parties' submissions are a private business dispute, essentially a pair of customer complaints. The complaints were statements of alleged fact regarding the Defendants' individual customer experiences. For one Defendant, these expanded to generalized allegations levelled at the business, qualifications, and business practices. Those statements were made on the internet in social media fora that had restricted distribution rather than fully public.
>
> . . . [A]s in *Zueger [v. Goss*, 2014 COA 61], the allegations made here are of a private business dispute made on the internet. The court does not find that anything about the nature of veterinary services or their arguable location in a "small community" (in context this characterization of this community on the border of a large city is questionable) renders such matters of public interest for purposes of the [anti-SLAPP statute].

¶ 9    In the alternative, the court determined that, even if the case had fallen within the scope of the statute, it could not be dismissed because Tender Care had demonstrated a reasonable likelihood of prevailing on its claims.

¶ 10    Defendants now appeal, contending that the district court erred by denying their special motion to dismiss.

## II.    Legal Principles and Standard of Review

¶ 11    The General Assembly enacted section 13-20-1101 "to address lawsuits aimed at stifling or punishing the exercise of the First Amendment rights to free speech and to petition the government." *L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 1.  The statute's purpose is to "encourage and safeguard" the exercise of these rights "to the maximum extent permitted by law and, at the same time, to protect the rights of persons to file meritorious lawsuits for demonstrable injury."  § 13-20-1101(1)(b).

¶ 12    To effectuate the balancing of these interests, the statute provides a process for weeding out, at an early stage, nonmeritorious lawsuits brought in response to a defendant's petitioning or speech activity.  *See Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 12.  If a plaintiff's claims arise from any act by a

defendant in furtherance of his or her right of petition or free speech in connection with a public issue, the court must grant the defendant's special motion to dismiss unless it determines that the plaintiff has shown a reasonable likelihood that he or she will prevail on the claims. § 13-20-1101(3)(a).

¶ 13 The resolution of a special motion to dismiss involves a two-step process. At the first step, the defendant has the burden to show that the conduct underlying the plaintiff's claims falls within the statute — i.e., that the claim arises from the defendant's exercise of his or her right of petition or free speech. *L.S.S.*, ¶ 21. Under the statute, a protected act in furtherance of a person's right of petition or free speech includes the following:

> (I) Any written or oral statement or writing made before a legislative, executive, or judicial proceeding or any other official proceeding authorized by law;
>
> (II) Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other official proceeding authorized by law;
>
> (III) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or

6

> (IV) Any other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

§ 13-20-1101(2)(a).

¶ 14     If the conduct does not fall within the statute's scope, then the special motion to dismiss must be denied.  If, however, the conduct falls within the statute's scope, then the analysis proceeds to a second step.  At this second step, the burden shifts to the plaintiff to establish a reasonable likelihood of prevailing on the claim. *Rosenblum v. Budd*, 2023 COA 72, ¶ 24; *Salazar*, ¶ 21.[2]  If the

---

[2] As the United States District Court for the District of Colorado recognized, divisions of this court differ on how to apply this second step.  *See Coomer v. Make Your Life Epic LLC*, ___ F. Supp. 3d ___, ___, 2023 WL 2390711, at *3 (D. Colo. Mar. 7, 2023).

One division, noting the similarity of the "reasonable likelihood of prevailing" standard to that used in evaluating requests for preliminary injunctive relief, would neither "accept the truth of the allegations nor make an ultimate determination of their truth," but would simply analyze the pleadings and affidavits to determine "whether the allegations and defenses are such that it is reasonably likely that a jury would find for the plaintiff."  *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶¶ 17, 20-21.

Other divisions, looking to California case law interpreting a similarly worded anti-SLAPP statute for guidance, have described

7

plaintiff makes such a showing, the motion to dismiss must be denied.  If the plaintiff fails to make such a showing, the special motion to dismiss must be granted.

¶ 15    We review de novo a district court's ruling on a special motion to dismiss.  *L.S.S.*, ¶ 19; *Salazar*, ¶ 21.

¶ 16    Because California's anti-SLAPP statute, Cal. Civ. Proc. Code §§ 425.16-.17 (West 2023), closely resembles Colorado's statute, we look to California case law for guidance in construing and applying section 13-20-1101.  *L.S.S.*, ¶ 20; *see also Moreau v. U.S. Olympic & Paralympic Comm.*, 641 F. Supp. 3d 1122, 1129 (D. Colo. 2022) (explaining that, because of the similarities between California's and

---

the second step as involving more of a "summary judgment-like procedure" in which the court reviews the pleadings and proffered evidence, "accepts the plaintiff's evidence as true," and determines "whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment."  *L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 23 (quoting *Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016)); *accord Anderson v. Senthilnathan*, 2023 COA 88, ¶ 11; *Gonzales v. Hushen*, 2023 COA 87, ¶ 21; *Creekside Endodontics, LLC v. Sullivan*, 2022 COA 145, ¶¶ 31-33.

Because of the manner in which we resolve this appeal, we need not decide which of these approaches we would use.

Colorado's respective anti-SLAPP statutes, state and federal courts have looked to California case law in construing Colorado's statute).

### III. Analysis

¶ 17 Defendants contend that the district court erred by not granting their special motion to dismiss Tender Care's defamation claims. They assert that, contrary to the district court's ruling, (1) their statements qualified for protection under step one of the anti-SLAPP analysis because they addressed a "public issue" or "issue of public interest"; *and* (2) Tender Care cannot, under step two of the analysis, show a reasonable likelihood of prevailing. We disagree with their first assertion and do not need to address their second.

### A. Step One: Protected Activity

¶ 18 Because defendants' statements were not made in connection with any executive, legislative, or judicial body or function, *see* § 13-20-1101(2)(a)(I)-(II), the protections of the anti-SLAPP statute apply only if the statements were made "in connection with" a "public issue" or "an issue of public interest," § 13-20-1101(2)(a)(III)-(IV). According to defendants, their statements

qualify as such because they were honest, online reviews of a veterinary practice serving a small, rural community.

¶ 19    Initially, we agree that internet sites available to the public (like Facebook) are "public forums" for anti-SLAPP purposes. *See Muddy Waters, LLC v. Superior Ct.*, 277 Cal. Rptr. 3d 204, 214-15 (Ct. App. 2021) (collecting California cases); *see also Anderson v. Senthilnathan*, 2023 COA 88, ¶ 24 (noting that statements made on social media and before the legislature qualified as having been made in a public forum). But not every website posting involves a "public issue" or an "issue of public interest." *D.C. v. R.R.*, 106 Cal. Rptr. 3d 399, 426 (Ct. App. 2010); *see Bikkina v. Mahadevan*, 193 Cal. Rptr. 3d 499, 508 (Ct. App. 2015) ("[A] person cannot turn an otherwise private matter into a matter of public interest simply by communicating it to a large number of people."); *Du Charme v. Int'l Brotherhood of Elec. Workers*, 1 Cal. Rptr. 3d 501, 509 (Ct. App. 2003) ("[M]ere publication . . . on a Web site[] should not turn otherwise private information . . . into a matter of public interest."); *cf. Zueger*, ¶ 28 (holding that a widow's statements on the internet about the plaintiffs' business activity, stemming from her contention that the plaintiffs were making and selling unauthorized

10

reproductions of her deceased husband's artwork, did not involve a matter of public concern).

¶ 20    There is no statutory definition of the terms "public issue" or "issue of public interest." In applying these terms, the district court found useful those cases discussing "whether a matter is one of 'public concern'" for First Amendment freedom of speech purposes. "Generally, a matter is of public concern whenever 'it embraces an issue about which information is needed or is appropriate,' or when 'the public may reasonably be expected to have a legitimate interest in what is being published.'" *Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) (quoting *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1121 (Colo. App. 1992)).

> Somewhat more specifically, a matter is of public concern when "it can be fairly considered as relating to any matter of political, social, or other concern to the community," or when it involves "the use of names, likenesses or facts in giving information to the public for purposes of education, amusement, or enlightenment when the public may reasonably be expected to have a legitimate interest in" the subject.

*McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008) (first quoting *Barrett v. Univ. of Colo. Health Scis. Ctr.*, 851 P.2d 258, 263

11

(Colo. App. 1993); and then quoting *Lewis*, 832 P.2d at 1121); *see City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (For First Amendment purposes, a matter is of public concern when it is "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."); *Zueger*, ¶ 27 ("[A] matter of public concern is one that affects a broad segment of the community or affects a community in a manner similar to that of a governmental entity." (quoting *McIntyre*, 194 P.3d at 526)).

¶ 21     California courts interpret the terms "public issue" or "issue of public interest" in their anti-SLAPP statute in a similar manner. "In articulating what constitutes a matter of public interest," they

> look to certain specific considerations, such as whether the subject of the speech or activity "was a person or entity in the public eye" or "could affect large numbers of people beyond the direct participants"; and whether the activity "occur[red] in the context of an ongoing controversy, dispute or discussion," or "affect[ed] a community in a manner similar to that of a governmental entity."

*FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1162 (Cal. 2019) (citations omitted); *see also Woodhill Ventures, LLC v. Yang*, 283 Cal. Rptr. 3d 507, 512-13 (Ct. App. 2021) (noting "three

categories of statements or conduct that qualify as 'public interest': 1. Statements or conduct that concern a person or entity in the public eye; 2. Statements or conduct that could directly affect a large number of persons beyond the direct participants; and 3. Statements or conduct involving a topic of recognizing widespread interest").

¶ 22　　Here, defendants' statements did not concern political or social issues, public officials, people or businesses that had been the subject of news articles, a large number of persons,[3] or even a topic of widespread public interest.  But defendants maintain that their statements nonetheless qualify for anti-SLAPP protection because they conveyed important consumer information about a significant "public issue" or "issue of public interest" — that is, the quality of veterinary services in a small, rural community.

---

[3] From the record, it appears that forty-nine people across six websites participated in discussing Tender Care's services and business practices.  Fourteen people (besides Lind-Barnett and Davis) related having had negative firsthand experiences with Tender Care; eleven others related negative information about Tender Care they'd "heard" from others; and several others reported having had positive experiences with Tender Care.  (Tender Care asserted that it, its owners, and most of its staff were blocked or restricted from participating in the discussions on these websites.)

¶ 23    While not identical, this position finds some support in California cases concluding that online postings about the quality of medical care or the competence of medical doctors or dentists can involve issues of public concern or interest.  *See, e.g.*, *Haworth v. Pinho*, No. B313430, 2023 WL 3017282, at *1-13 (Cal. Ct. App. Apr. 20, 2023) (unpublished opinion) (posts or articles on website concerned doctor's competence to perform surgical services, his professional conduct, and the financial fitness of his medical practice, "matters about which the public, including current and future patients, have a vital interest"); *Yang v. Tenet Healthcare Inc.*, 262 Cal. Rptr. 3d 429, 433-34 (Ct. App. 2020) (physician's allegedly deficient ethics and qualification constituted public issue); *Healthsmart Pac., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 599 (Ct. App. 2016) (Consumers "have an interest in being informed of issues concerning particular doctors and health care facilities."); *Wong v. Jing*, 117 Cal. Rptr. 3d 747, 759 (Ct. App. 2010) (holding that negative Yelp review of experience with dentist involved a public issue where post discussed use of silver amalgam containing mercury in treating children); *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 761 (Ct. App. 2007) (finding patient's website concerned a matter of

public interest that, rather than solely attacking plaintiff doctor, contributed toward public discussion and debate about the benefits and risks of plastic and cosmetic surgery); *see also Aristocrat Plastic Surgery, P.C. v. Silva,* 169 N.Y.S.3d 272, 276–77 (App. Div. 2022) (posting reviews of experience with plastic surgeon "to provide information to potential patients, including reasons not to book an appointment with [the doctor]," was matter of public interest); *cf. Carver v. Bonds*, 37 Cal. Rptr. 3d 480, 493 (Ct. App. 2005) (newspaper article critical of medical practitioner involved an issue of public interest because it contained consumer warning information).

¶ 24 We perceive no reason why a different conclusion should be reached in cases involving consumer information about veterinary services. After all, "the welfare of animals, including pets, is an important concern of our society." *In re Marriage of Isbell*, No. B173850, 2005 WL 1744468, at *1 (Cal. Ct. App. July 26, 2005) (unpublished opinion). "It cannot be doubted that a special relationship exists between humans and dogs. . . . The expression 'a dog is a man's best friend' attests to the joy and closeness often experienced between people and dogs." *State v. Anderson*, 566

15

N.E.2d 1224, 1225-26 (Ohio 1991). So too with cats and other pets — all of whom may require veterinary services to retain or maintain their health. *See Sacks v. Haslet*, No. D072372, 2018 WL 4659509, at *8-9 (Cal. Ct. App. Sept. 28, 2018) (unpublished opinion) (whether trainer was qualified to care for animals and posed a danger to them were issues of public interest).

¶ 25 And as it does with the practice of medicine, Colorado promotes public health, safety, and welfare by regulating the practice of veterinary medicine to "safeguard[] the people of this state against incompetent, dishonest, or unprincipled practitioners." § 12-315-102, C.R.S. 2023. A veterinarian is "a person who has received a doctor's degree in veterinary medicine, or its equivalent, from a school of veterinary medicine," § 12-315-104(18), C.R.S. 2023, and is subject to discipline by the State Board of Veterinary Medicine for "[i]ncompetence, negligence, or other malpractice in the practice of veterinary medicine," § 12-315-112(1)(k), C.R.S. 2023.

¶ 26 Thus, while Tender Care maintains the posts aren't subject to the anti-SLAPP statute because they relate to a purely private business dispute, we note that "speech or conduct, considered in

16

light of its context, may [nonetheless] reasonably be understood to implicate a public issue, even if it also implicates a private dispute." *Geiser v. Kuhns*, 515 P.3d 623, 633–34 (Cal. 2022).

¶ 27    But the step-one analysis does not end with the identification of a public concern, issue, or interest to which statements could theoretically relate. A particular type of nexus must exist between the challenged statements and the asserted issue of public interest. *FilmOn.com*, 439 P.3d at 1165.

> Agile thinkers always can create some kind of link between a statement and an issue of public concern. All you need is a fondness for abstraction and a knowledge of popular culture.
>
> This pervasive potential means there must be "some degree of *closeness* between the challenged statements and the asserted public interest." A tangential relationship is not enough. There is "a need to go beyond the parochial particulars of the given parties."

*Woodhill Ventures, LLC*, 283 Cal. Rptr. 3d at 513 (citations omitted).

¶ 28    "[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *FilmOn.com*, 439 P.3d at 1166 (quoting *Wilbanks v. Wolk*, 17 Cal. Rptr. 3d 497, 506 (Ct. App.

2004)).  And that determination can "hardly [be] undertake[n] without incorporating considerations of context — including audience, speaker, and purpose."  *Id*.; *see McIntyre*, 194 P.3d at 525 ("In determining whether statements involve a matter of public concern, we . . . analyze 'the content, form, and context of the statements, in conjunction with the motivation or "point" of the statements as revealed by the whole record.'" (quoting *Barrett*, 851 P.2d at 263)).

¶ 29    To illustrate, in *Gilbert*, 53 Cal. Rptr. 3d at 756, a patient who was unhappy with the results of her plastic surgery created a website that, among other things, provided consumer information and advice for those considering plastic surgery.  The site also related her negative experiences with the doctor who performed her surgery.  The doctor sued her for defamation.  In granting the patient's motion to dismiss under California's anti-SLAPP statute, the court rejected the doctor's claim that the statements did "not contribute to the public debate because they only concern[ed] [the patient's] interactions with *him*."  *Id.* at 760.  The court instead concluded that "plastic surgery is a subject of widespread public interest and discussion" and the patient's website contributed to

18

the public debate about plastic surgery by providing information on the "benefits and risks of plastic surgery in general." *Id.* The website did this by including not just the patient's personal negative experience, but also general advice, information, and resources for those considering plastic surgery as well as a contact page for shared experiences. *Id.* Thus, the court concluded the website was a matter of public interest because it "was not limited to attacking [the physician], but contributed to the general debate over the pros and cons of undergoing cosmetic surgery." *Id.* at 762; *see also Wong,* 117 Cal. Rptr. 3d at 760 (Yelp review about a pediatric dentist's use of nitrous oxide and silver amalgam for fillings was a matter of public interest because it "was not just a highly critical opinion of [the dentist]"; it "was [also] part of a public discussion" on the use of nitrous oxide and silver amalgam in treating children, which is an issue of public interest).

¶ 30    Defendants argue their posts are similarly protected because their posts (or at least a few of them) related to their claim that Tender Care had misdiagnosed their pets. But unlike the patient's consumer website in *Gilbert,* defendants' posts did not contribute to any broader public discussion about pet health care or connect to

any broader issue of public concern — for example, veterinary diagnostic issues, shortages in or access to veterinary care, oversight of veterinarians, the general quality of care for animals outside large cities, veterinarians' lack of training for the care of smaller dogs, or how overbreeding can cause health problems for certain animals. *See Gilbert*, 53 Cal. Rptr. 3d at 761; *Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234, 246 (Ct. App. 2017) ("[S]imply because a general topic is an issue of public interest, not every statement somewhat related to that subject is also a matter of public interest within the meaning of [the statute]."); *cf. Whitelock v. Stewart*, 661 S.W.3d 583, 596 (Tex. App. 2023) ("[C]ommunications about animal abuse can be considered of concern to the public or of interest to the community.").

¶ 31     Rather, read in context, the posts' purpose was, in Lind-Barnett's own words, "to deal with [Tender Care] once and for all" — that is, to exact some revenge by putting it out of business. *See Woodhill Ventures, LLC*, 283 Cal. Rptr. 3d at 516 ("Courts must scrutinize the purpose of the statements . . . ."). "But 'an attempt to exact a personal revenge' by causing others to ostracize the target is

not a protected public interest statement." *Id.* at 515 (quoting *Wilbanks*, 17 Cal. Rptr. 3d at 508 n.6).

¶ 32    And even if we assume a couple of the diagnostic statements went beyond defendants' parochial issues concerning their pets' disputed diagnoses and connected to some broader public discussion, when a plaintiff pleads claims based on both protected and unprotected conduct, anti-SLAPP protections don't apply if "the protected conduct is 'merely incidental' to the unprotected conduct." *Comstock v. Aber*, 151 Cal. Rptr. 3d 589, 601 (Ct. App. 2012) (quoting *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 40 (Ct. App. 2005)); *see Gaynor v. Bulen*, 228 Cal. Rptr. 3d 243, 257-58 (Ct. App. 2018); *accord Hylton v. Frank E. Rogozienski, Inc.*, 99 Cal. Rptr. 3d 805, 810 (Ct. App. 2009) ("If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute.").

¶ 33    Here, the posts related to the alleged misdiagnoses are far eclipsed by the numerous posts expressing Lind-Barnett's personal

animosity toward the business. Specifically, of the thirty-seven statements Lind-Barnett initially posted on Tender Care's Facebook page, only eight expressly related to information regarding Pinkerbell's treatment and diagnosis by Tender Care.[4] Most of the posts simply attack Tender Care and its staff. Specifically, Lind-Barnett expressed her displeasure with the clinic personnel's response to her complaints (she called them bullies and liars who tried to intimidate her) and with the Tender Care's refusal to refund her money and apologize to her.[5] Similarly, with the exception of

---

[4] This posting is reproduced as Appendix A to this opinion. It was reposted, in its entirety, on the community Facebook pages. And it was reposted on Lind-Barnett's Facebook page with four additional sentences, none of which related to diagnostics or business practices. *See* Appendix B (Lind-Barnett's posting on her Facebook page).

[5] Lind-Barnett stated several times that what she initially wanted was a refund from Tender Care:
- "I gave them a chance to make it right and instead of an apology we got false accusations and were treated cruely (sic) and with distain (sic)."
- "As the PRETEND 'head vet' clearly stated in her verbal assault on me (which we recorded) they DO NOT give money back."
- "All I want is for them to make it right. My money back would be a great start. An apology would be such an amazing way to handle such mistreatment of their customers."

four sentences recounting her dog's treatment, Davis's comments are primarily commentary on/agreement with Lind-Barnett's personal attacks.

¶ 34    Lind-Barnett insists that many of her statements served the public interest of warning others of Tender Care's allegedly substandard care.  But in context, the purpose of her "warnings" was simply to call others to join her crusade against Tender Care to punish it for what she thought was an inadequate response to her criticisms.[6]  Labelling a diatribe against a business as a "warning" does not transform the statements into protected conduct under the anti-SLAPP statute.  *See Woodhill Ventures, LLC*, 283 Cal. Rptr. 3d at 516 (where the purpose is simply to gather "'ammunition for another round,' it is not in the public interest") (citation omitted);

---

[6] To that end, we note the following about the "warnings":
- In response to Lind-Barnett questioning how Tender Care could still be in business, a commentor wrote, "Hopefully they won't be when you get done with them," to which Lind-Barnett replied, "I[]hope so!"
- Lind-Barnett called other commentors to action, stating "I have a group of folks wanting to go to court and deal with this once and for all."
- Lind-Barnett warned the other posters, "THEY ARE GOING TO WISH THEY HAD NEVER TRIED TO BULLY ME AND MY FAMILY."

*see also Jeppson v. Ley*, 257 Cal. Rptr. 3d 921, 928–29 (Ct. App. 2020) (online post reigniting neighborhood feud didn't become a matter of public concern just because one neighbor purportedly felt compelled to warn others of a second neighbor's potential for gun violence). If that were the case, any statement, no matter how defamatory, would be protected by simply adding some generic consumer "warning" in the statement.

¶ 35 In sum, the vast majority of Lind-Barnett's and Davis's statements cannot be said to involve a "public issue" or "issue of public interest" because they weren't directed at "seek[ing] public discussion of anything"; they appeared, instead, to be aimed at "whip[ping] up a crowd for vengeful retribution." *Woodhill Ventures, LLC*, 283 Cal. Rptr. 3d at 513.

¶ 36 Focusing, as we must, "on 'the specific nature of the speech,' rather than on any 'generalities that might be abstracted from it,'" *FilmOn.com*, 439 P.3d at 1167 (quoting *Commonwealth Energy Corp. v. Investor Data Exch., Inc.*, 1 Cal. Rptr. 3d 390, 395 (Ct. App. 2003)), we conclude that the core of defendants' conduct does not rest on protected speech and, thus, is not protected under the anti-SLAPP statute. *See Sacks*, 2018 WL 4659509, at *8-9 (Anti-SLAPP

24

protection does not apply "any time individuals have a dispute over a particular animal merely because the subject of animal welfare is important to many people. The public interest aspect of the anti-SLAPP statute applies only when the specific challenged speech is directed at the larger public issue.").

## B. Step Two: Likelihood of Prevailing

¶ 37 Because we conclude that defendants' speech does not fall under the protection of the anti-SLAPP statute, there is no need for us to additionally determine whether Tender Care can prove a reasonable likelihood of prevailing in its defamation suit.

## IV. Disposition

¶ 38 The order denying the special motion to dismiss is affirmed.

JUDGE DUNN and JUDGE HARRIS concur.

Appendix A

These images are reproduced in their original format, with redactions to remove other comments.



26

puppy had pneumonia, she said it appeared AFTER leaving their clinic. Another lie, which I have the paperwork to prove! She attacked me verbally on the phone stating all the reasons "her" vets were perfect and made not one mistake, and how I WAS RESPONSIBLE FOR GIVING HER PNEUMONIA!? I have the vet's notes from tender care PROVING she had breathing difficulties when I walked into tender care and was even placed on OXYGEN! Despite that, she was still sent home completely dehydrated, lungs full of fluid and her skin was tenting! The worst part is that THEY REFUSED TO GIVE ME A CHEST X-RAY even though I asked and they also REFUSED TO GIVE HER ABX despite me again asking for ABX! The vet talked to me like I was stupid and wrote in her notes that my puppy was constipated, despite the fact that I had a picture of her poop and showed the vet she was indeed NOT constipated!!!!!

I have never witnessed such blatant ignorance and lack of training in my entire life. The vet tried to convince me that my puppy was too small to have an x-ray done and that, and I quote "puppies have fat pockets that keep us from seeing much on an x-ray"!?!?!? Oh my God! I have her x-rays, from the next morning and they showed CLEARLY that her lungs were entirely full of fluid and her stomach full of air from gasping for breath!!!

So far, we have been INTIMIDATED (which didn't work, because I don't tolerate bullies), lied to MULTIPLE TIMES, falsely accused and then ghosted! They refused to give us our money back and we have been trying to get a call back for WEEKS!

I gave them a chance to make it right and instead of an apology we got false accusations and were treated cruely and with distain.

I am native to this area, a long time breeder, trainer, sitter and caregiver for literally thousands of animals (both small and large animals) in Colorado over the past 20 years of my career here. Every one of my clients is going to know about this situation throughout this entire area and I hope to God my testimony can help those who don't know any better avoid the heartbreak that a team

🔒 facebook.com

27

don't know any better avoid the heartbreak that a team of bullies like tender care tried to inflict on me and ny family.

Tender care... ha! There is nothing about them that resonates with tender OR care.

More like belligerence and avoidance.

Do yourself a favor, drive the extra 20 minutes for the best care possible and AVOID a travesty in your home and a hole in your pocket.

As the PRETEND "head vet" clearly stated in her verbal assult on me (which we recorded), they DO NOT give money back.

Tender care or NO cares given? You all decide.

👍 Like          💬 Comment          ↪ Share

👍❤️😲 5

4 Shares



Write a reply...                                    Reply

🔒 facebook.com

28

Appendix B

These images are reproduced in their original format, with

redactions to remove personal information unrelated to this action.



Friends

Posts

📷 Photos          ⭐ Life events

**Jennifer Rae Barnett**                          •••
March 18 at 12:52 PM · 🌐

An honest review about a dishonest clinic.

"TENDER CARE IN FALCON"

I have never had such a horrid experience in my life than I did at this joke of a clinic. The vets here are not only incompetent, but cruel. When I tried to address a SERIOUS issue of malpractice with them they used LIES and INTIMIDATION methods to try and shut me up. One of my clients was threatened with a lawyer by them for speaking out publicly about their awful clinic. Apparently, speaking the truth in now called slander. I don't care about a lawsuit and in fact, if they do come after me I will gladly take them down in court. I have signed testimonies from the vet who actually saved my dog's life that prove they are... More

👍😮😢 15                    22 Comments  2 Shares

👍 Like          💬 Comment          ↪ Share

🔒 facebook.com

29

gladly take them down in court. I have signed testimonies from the vet who actually saved my dog's life that prove they are responsible for almost killing her and that my care and fast action saved her life. Thankfully I have a background in health-care and didn't listen to their bullying and ignorance. I was able to save my dog's life after they almost killed her through their ignorance. And then of course tried to blame me for their lack of care. 🤣

They sent me home with my puppy in CRITICAL condition and told me to "rub her belly"!!! Had I actually done that, she would be dead! 😡 This is a very serious situation and this clinic is the biggest scam to ever walk into our town. I have witnesses who were at tender care and heard/saw everything, as well as a signed note from the second vet we went to PROVING that my puppy was indeed in respiratory distress and fighting for her life when I made the mistake of taking her to tender care. A low ranking vet tech by the name of Jessica, actually led me to believe she was the head vet at the clinic! It was laughable! She proceeded to falsely accuse me of being the reason my puppy had pneumonia, she said it appeared AFTER leaving their clinic. Another lie, which I have the paperwork to prove! Jessica attacked me verbally on the phone stating all the reasons "her" vets were perfect and made not one mistake, and how I WAS RESPONSIBLE FOR GIVING HER PNEUMONIA!? I have the vet's notes from tender care PROVING she had breathing difficulties when I walked into tender care and was even placed on OXYGEN! Despite that, she was still sent home completely dehydrated, lungs full of fluid and her skin was tenting! The worst part is that THEY REFUSED TO GIVE ME A CHEST X-RAY even though I asked and they also REFUSED TO GIVE HER ABX despite me again asking for ABX! The vet talked to me like I was stupid and wrote in her notes that my puppy was constipated, despite the fact that I had a picture of her poop and showed the vet she was indeed NOT constipated!!!!!

I have never witnessed such blatant ignorance and lack of training in my entire life. The vet tried to convince me that my puppy was too small to have an x-ray done and

🔒 facebook.com

30

that my puppy was too small to have an x-ray done and that, and I quote "puppies have fat pockets that keep us from seeing much on an x-ray"!?!?!? Oh my God! I have her x-rays, from the next morning and they showed CLEARLY that her lungs were entirely full of fluid and her stomach full of air from gasping for breath!!!

I am still seeking legal advice as to how to proceed. So far, we have been INTIMIDATED (which didn't work, because I don't tolerate bullies), lied to MULTIPLE TIMES, falsely accused and then ghosted! They refused to give us our money back and we have been trying to get a call back for WEEKS!

THEY ARE GOING TO WISH THEY HAD NEVER TRIED TO BULLY ME AND MY FAMILY. I gave them a chance to make it right and instead of an apology we got false accusations and were treated cruelly and with distain.

I am native to this area, a long time breeder, trainer, sitter and caregiver for literally thousands of animals (both small and large animals)in Colorado over the past 20 years of my career here. Every one of my clients is going to know about this situation throughout this entire area and I hope to God my testimony can help those who don't know any better avoid the heartbreak that a team of bullies like tender care tried to inflict on me and ny family.

Tender care... ha! There is nothing about them that resonates with tender OR care.

More like belligerence and avoidance.

Do yourself a favor, drive the extra 20 minutes for the best care possible and AVOID a travesty in your home and a hole in your pocket.

As the PRETEND "head vet" clearly stated in her verbal assult on me (which we recorded), they DO NOT give money back.

Tender care or NO cares given? You all decide.



Like     Comment     Share

🔒 facebook.com

31